

CAUSE NO. 03 03314

FILED

2003 APR 14 PM 3: 41

JIM HAMLIN
DISTRICT CLERK
DALLAS CO., TEXAS

DEPUTY

| | | |
|---|---|---|
| AVIA ENERGY DEVELOPMENT, LLC; AVIA | § | IN THE DISTRICT COURT |
| DE MEXICO S. DE R.L. DE C.V.; AND JAMES | § | |
| C. MUSSELMAN, | § | |
| Plaintiffs, | § | |
| | § | K-192nd |
| v. | § | JUDICIAL DISTRICT |
| | § | |
| CARLOS FRANCISCO NAVARRO AND BBVA | § | |
| BANCOMER, S.A., INSTITUCION DE BANCA | § | |
| MULTIPLE, GRUPO FINANCIERO BBVA | § | |
| BANCOMER, | § | |
| | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs' Avia Energy Development, LLC, Avia de Mexico S. De R.L. de C.V., and James

C. Musselman, file this Plaintiffs' Original Petition and for cause of action will show the following:

### Discovery Control Plan

1.     The Plaintiffs intend that discovery in this case shall be conducted under Level 3, as

described by Texas Rule of Civil Procedure 190.

### Parties and Jurisdiction

2.     Plaintiff Avia Energy Development, L.L.C. (hereinafter "Avia USA") is a Texas

limited liability company with its principal place of business in Dallas County, Texas.

3.     Plaintiff Avia de Mexico S. De R.L. De C.V. (hereinafter "Avia Mexico") is a

Mexican corporation.

4.     Plaintiff James C. Musselman (hereinafter "Mr. Musselman) is a natural person who resides and did reside at all relevant times in Dallas County, Texas.

5.     Defendant Carlos Francisco Navarro (hereinafter "Mr. Navarro" or "Dr. Navarro") is a natural person who resides and did reside at all relevant times in Dallas County, Texas. Mr. Navarro may be served with process at his office address, 4514 Cole Avenue, Suite 910, Dallas, Texas 75205, or wherever he may be found.

6.     Defendant BBVA Bancomer, S.A., Institucion de Banca Multiple, Grupo Financiero BBVA Bancomer (hereinafter "Bancomer") is, upon information and belief, a Mexican Banking Association. The court has jurisdiction over Bancomer because it does business in Texas, maintains a registered agent for service of process in Texas and breached a contract with, and/or committed a tort against, one or more Plaintiffs. Bancomer may be served with process by serving its registered agent for service of process, BBVA Bancomer Securities International, Inc., at its registered office, 5075 Westheimer Road, Galleria Financial Center, Houston, Texas 77056.

<u>Venue</u>

7.     Venue is proper in Dallas County because it is the county of Dr. Navarro's residence at the time the cause of action accrued against Dr. Navarro.

<u>Factual Allegations</u>

8.     On February 18, 1998, a contract, with a total value of ninety-million U.S. dollars ($90,000,000.00) was awarded by PEMEX to Construcciones Protexa (COPROSA) to drill 38 natural gas wells in Northern Mexico's Burgos Basin (hereinafter the "contract"). The contract was

supported by an alliance of American and Mexican companies. The American companies were organized by Avia Energy Development, LLC of Dallas, Texas (hereinafter "Avia USA"). The investors in Avia USA were Hicks, Muse, Furst & Tate of Dallas, Texas; Michael Petroleum Corporation of Houston, Texas, and James C. Musselman.

9.    COPROSA and Avia Mexico, a wholly-owned subsidiary of Avia USA, formed a joint venture to carry out the PEMEX contract. The American and Mexican subcontractors executed agreements to provide their specific services in accordance with the PEMEX contract.

10.    The American Alliance companies were (and their respective responsibility was):

(1) BJ Services Company, Houston, Texas (Cementing and fracturing),
(2) Baker Hughes Inteq, Houston, Texas (Directional drilling),
(3) Computalog USA, Inc., Ft. Worth, Texas (Logging and perforating),
(4) Camco/Reed Tools, Houston, Texas (Drill bits),
(5) Norton Drilling Company, Lubbock, Texas  (Drilling rigs),
(6) Vinson Supply Company, Dallas, Texas (Tubular goods),
(7) Kvaerner, Houston, Texas (Wellhead),
(8) Global Oil Tool, Houston, Texas (Valves and fittings),

11.    The project was officially initiated on March 6, 1998, with the first well to begin on April 15, 1998. Due to numerous delays in PEMEX obtaining land owner approval for locations, the original drilling contractors' unwillingness to accept country risk, and other bureaucratic and logistical delays, the initial well was not begun until June 17, 1998. The Project was further delayed by the logistical problems involved in moving the infrastructure of American drilling operations to Mexico. In addition, obtaining permits for drilling equipment, logging trucks, pipes, and other equipment took much longer than anticipated.

12.    COPROSA, Avia USA/Mexico, and Avia USA/Mexico investors invested five-million dollars ($5,000,000.00) in start-up capital for, among other things, the purchase of PEMEX vehicles, remodeling PEMEX offices, and providing PEMEX with furniture, computers, and other

office equipment. However, though PEMEX was providing assistance to other drilling groups (Schlumberger and Halliburton), PEMEX refused to assist in moving the American Alliance's equipment into Mexico.

13.    In June, 1998, two drilling rigs owned by Norton Drilling Company were imported from the United States to initiate the drilling of the natural gas wells. Due to the delays COPROSA and Avia USA desired to drill the wells faster. Thus, in October, 1998, (with PEMEX's approval) a third drilling rig was imported. By this date, the American Alliance had mobilized to the project location in Mexico in excess of thirty-million U.S. dollars ($30,000,000.00) worth of American equipment plus the operating and support manpower. All the subcontractors established offices in Mexico and hired local help to support their operations.

14.    Fourteen wells were expected to be finished by December 31, 1998. However, due to all of the delays, only six wells were completed in the first seven months. Nevertheless, with the addition of the third drilling rig, and coupled with the fact that most of the necessary equipment and services were now in Mexico, six additional wells were drilled and completed in the next forty-five days.

15.    However, on February 10, 1999, PEMEX terminated the contract. PEMEX, because of conflicts (unrelated to the project) it had with Grupo Protexa ('Protexa'), the parent company of COPROSA., sought to cause COPROSA to default on the contract by creating numerous delays and "roadblocks" that had a detrimental effect on the performance and progress of the project. For example and upon information and belief, there were three additional contractors that performed work under agreements similar to the contract in the Burgos Basin. Those contractors all had similar

problems with initial logistics and organization, and all missed numerous critical dates in their

contracts. However, PEMEX did not cancel any of their arrangements.

16.    Payments due under the contract were assigned to a "Fideicomiso," or trust, at BBVA

Bancomer, S.A., Institucion de Banca Multiple, Grupo Financiero BBVA Bancomer, Inc.

('Bancomer') to allow for the direct payment to the subcontractors. Five payments were made for

the six initial wells. However, PEMEX refused to pay approximately sixteen-million dollars

($16,000,000.00) due to Protexa and the American Alliance for completed wells accepted by

PEMEX.

17.    The American Alliance Companies, for a period of over two years, attempted to reach

an settlement with PEMEX regarding the monies owed. Finally, as required by the contract, Protexa,

on behalf of the American Alliance, filed for arbitration in the International Court of Arbitration.

In the first quarter of 2002, the International Court of Arbitration ruled in favor of Protexa and the

American Alliance. PEMEX disputed the result for the remainder of the year, but finally agreed in

early 2003 to pay

18.    The $16,859,000.00 was deposited in the "Fideiocomiso trust account" at Bancomer

(hereinafter the "account"). Payments were made to all parties interested pursuant to instructions

sent to the Trustee by the Technical Committee (a panel of four persons appointed when the trust

was established). The Technical Committee gave the trustee explicit instructions to disburse funds

from the trust only upon receipt of the following information: Company Name, Amount, Wiring

Instructions to a specific bank account of the given company, all supported by an invoice that

showed that all Mexican taxes had been paid. After all subcontractors were paid, Avia USA, through

Avia Mexico, was to be paid two-million seven-hundred thirty-one thousand two-hundred twenty-

nine dollars and sixty-eight cents ($2,731,229.68). Avia USA, through Mr. Musselman, submitted

all the documents needed, along with wiring instructions, to the Trustee.

19.    On January 31, 2003, Mr. Musselman went to Bancomer's office in Monterrey,

Mexico, and was informed that the wiring instructions had been changed to another account. Jack

Lafield, a shareholder of Avia USA/Mexico and a member of the Technical Committee, had gone

to Monterrey on January 29, 2003 and instructed the Trustee to change the wiring instructions. Mr.

Lafield informed Mr. Musselman that Dr. Carlos Francisco Navarro ('Dr. Navarro') of Dallas, Texas,

a member of Avia USA/Mexico, had offered him $50,000.00 to go to Monterrey and change the

wiring instructions. Mr. Lafield returned to Monterrey on February 6, 2003, met again with the

Trustee, and withdrew his previous wiring instructions. Mr. Lafield and Mr. Musselman, as the only

legal representatives of Avia USA on the Technical Committee, reiterated the previous instructions

the Technical Committee had given the Trustee the previous week.

20.    The trustee that told Mr. Musselman that he did not have the proper Mexican invoice

for the money to be wired. However, as this was merely a return of capital that had been put into the

company, and not payment for services rendered, no invoice was necessary. Mr. Musselman, Avia

USA/Mexico's legal representative, has been attempting to secure an official invoice form for the

past two months and has retained KPMG in Mexico City to assist in the matter.

21.    On April 9, 2003, Mr. Musselman was informed by Protexa that Dr. Navarro, alleging

to be the legal representative of Avia USA and/or Avia Mexico, had filed a purportedly proper

invoice with the Trustee and had the $2,731,229.68 wired to an account in the name of Avia Mexico.

Mr. Musselman requested that the Trustee produce and all documents supporting the trustee's

decision to move the money out of the trust into the account of Dr. Navarro, but to date these documents have not been forwarded.

22.    The initial ownership of Avia USA/Mexico was as follows:

James C. Musselman  60%

Jack Lafield          20%

John Hughett          20%

Mr. Musselman agreed to fund the companies initially, and all agreed that Mr. Musselman would be paid back any monies that he had advanced before any money would be paid to either Mr. Lafield or Mr. Hughett. Mr. Musselman advanced approximately $400,000.00 in initial money, and then guaranteed a bank line with the First National Bank of Albany for $900,000.00. The bank is still owed by Avia USA approximately $450,000.00. Since the contract was cancelled by PEMEX in February 1999, Mr. Musselman personally spent well in excess of $100,000.00 for legal fees, travel, and other miscellaneous expenses on behalf of Avia USA/Mexico and in trying to get all the Alliance Companies paid monies they are owed.

23.    In the fall of 1999, Avia USA/Mexico was running short of working capital due to the initial delays referenced before. Mr. Musselman asked two friends to invest in the venture in order to get Avia USA/Mexico though the start-up crunch. Tom Hicks invested $1,500,000.00 and Jack Furst invested $500,000.00, in the form of a note with a 12% coupon, coupled with a 10% net profits interests in Avia Mexico's joint venture with Protexa in the PEMEX contract. This money was funded in September of 1998. Additional debt, in the amount of $1,000,000.00 was provided by Michael's Petroleum around November 1998. This debt was junior to the First National Bank of Albany debt and the Hicks and Furst note. Dr. Navarro approached Mr. Musselman in September

or October of 1998 and requested, agreed, and purchased a 10% interest in Avia USA/Mexico for

$200,000.00. Dr. Navarro alleges that he subsequently purchased the interests of Mr. Hughett and

Mr. Lafield. However, Mr. Musselman was never informed of these transactions, nor did he ever

approve of the transactions. Pursuant to the agreement between Mr. Musselman, Mr. Lafield, and

Mr. Hughett, no transfers could be made without Mr. Musselman's written consent. A true and

correct copy of that agreement is attached hereto as Exhibit B and incorporated by reference as if

fully set forth herein. Furthermore, upon information and belief, Mr. Navarro never consummated

his purchase of Mr. Hughett's interest.

24.    Mr. Musselman has acted as the legal (and in most cases only) representative of Avia

USA and Avia Mexico for the past five years. Dr. Navarro never provided any significant assistance

in operating Avia USA/Mexico, but rather appeared to be interested in the entities only when he

thought he would be able to quickly obtain monies from one or both. Mr. Musselman represented

Avia USA/Mexico in the above-described arbitration process (and funded Avia's portion of the costs

for the arbitration) and four separate lawsuits by creditors of Avia. Avia USA currently has unpaid

judgments against it.    True and correct copies of two such judgments are attached hereto

respectively as Exhibits C and D. Mr. Musselmanis personally owed $618,659.00 by Avia. The

judgments under appeal total approximately $520,075.00, and the secured debt totals $3,450,000.00.

Therefore, Avia's liabilities total approximately $4,588,734.00.

25.    The liabilities of Avia are more than double the only asset of Avia, namely the

$2,731,229.68 that Dr. Navarro improperly divested to his account in Bancomer. Mr. Musselman's

intent was to pay those monies to Avia's creditors, excluding himself.    Mr. Musselman is not

seeking any money from Avia USA or Avia Mexico.

Plaintiffs' Original Petition - Page 8

26.    Dr. Navarro has asserted in previous conversations (in February, 2003 [after his previous attempt to improperly divert the money]) that he, as a common member of Avia, is due some of the $2,731,229.68. Mr. Musselman spent several hours explaining the financial situation described above to an advisor of Dr. Navarro, and then another several hours with lawyers for Dr. Navarro in February, 2003. They all understood that there is no equity value for the Avia members.

27.    Dr. Navarro now asserts that he is the owner of Avia Mexico, and that disbursement of the monies is a Mexican matter. Avia Mexico is a wholly-owned subsidiary of Avia USA. At best, Dr. Navarro could theoretically only own 50% of both companies, but because there was no consent given by Mr. Musselman to the transfer of the membership interests to him, he owns only 10% of both companies.

28.    Dr. Navarro showed no interest in the companies when the companies were being sued or were being called to fund litigation and arbitration expenses. Dr. Navarro has only now come forward to date when there is $2,731,229.68 in a bank account in a country where he feels that he can create strategic leverage.

Cause of Action for Breach of Fiduciary Duties

29.    In the alternative, without waiving any other cause of action herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all allegations herein to the extent they are not inconsistent with the cause of action pleaded here, Mr. Navarro is liable to Mr. Musselman for breaching his fiduciary duties owed to Mr. Musselman.

30.    Mr. Navarro owed fiduciary duties to Mr. Musselman due to his being a joint-member with Mr. Musselman in Avia USA and Avia Mexico. Those duties included but may not be limited

to a duty (1) of loyalty and utmost good-faith, (2) of candor, (3) to act with integrity of the strictest

kind, (4) of fair, honest dealing, and (5) of full disclosure. Bancomer owed fiduciary duties Avia

Mexico due to the establishment of the trust agreement. The Defendants breached their fiduciary

duties owed to one or more Plaintiffs, and such breach(es) resulted in and caused the Plaintiffs to

suffer monetary damages.


## Cause of Action for Conversion

31.    In the alternative, without waiving any other cause of action pleaded herein, without

waiving any procedural, contractual, statutory, or common-law right, and incorporating all other

allegations herein to the extent they are not inconsistent with the cause of action pleaded here, the

Defendants are liable to Avia Mexico for conversion. The Defendants have removed monies from

Avia Mexico's bank account and appropriated the monies for themselves or others. Such removal

was done in a manner inconsistent with and in derogation of Avia Mexico's right of ownership of

such monies. The intentional exercise of dominion or control over the monies so seriously interferes

with Avia Mexico's right to control it that the Defendants should pay Avia Mexico damages equal

to the full amount of the monies taken. In the alternative, the court should order the return of the

monies to Avia Mexico's bank account and/or sole control.


## Cause of Action for Negligence

32.    In the alternative, without waiving any other cause of action pleaded herein, without

waiving any procedural, contractual, statutory, or common-law right, and incorporating all other

Plaintiffs' Original Petition - Page 10

allegations herein to the extent they are not inconsistent with the cause of action pleaded here, the

Defendants are liable to the Plaintiffs for the Defendants' negligence. The Defendants owed the

Plaintiffs a duty to, among possibly other things, exercise reasonable care regarding the preservation

of Avia Mexico's monies. Bancomer breached those duties by, among possibly other things,

removing monies and/or transferring monies out of Avia Mexico's bank account at Bancomer. Mr.

Naverro breached those duties by, among possibly other things, allowing monies slated for payment

of Avia USA/Mexico's debt to be diverted and removed from Avia Mexico's bank account at

Bancomer. Bancomer breached those duties by, among possibly other things, failing to assure proper

documentary and other evidence prior to diverting the funds at issue. These breaches proximately

caused (1) Avia Mexico to be damaged by the loss of its monies, (2) Mr. Musselman to be damaged

by lost capital expenditures, attorneys' fees, and/or increased liabilities and (3) Avia Energy, L.L.C.

to be damaged by a loss of monies in Avia Mexico.

Request for a Constructive Trust

33.    In the alternative, without waiving any other cause of action pleaded herein, without

waiving any procedural, contractual, statutory, or common-law right, and incorporating all other

allegations herein to the extent they are not inconsistent with the relief requested here, the court

should impose a constructive trust upon the Defendants' funds and property in the Defendants'

possession, custody, or control and which were gained through removal and/or diversion of Avia

Mexico's funds from its bank account at Bancomer. A constructive trust is appropriate due to the

Defendants' egregious violations of their fiduciary duties. The court should disgorge all of the

Defendants' profits and monies gained through such violations, and the Defendants should forfeit

those profits and property to Avia Mexico.

## Breach of Contract

34.     In the alternative, without waiving any other cause of action pleaded herein, without

waiving any procedural, contractual, statutory, or common-law right, and incorporating all other

allegations herein to the extent they are not inconsistent with the cause of action pleaded here,

Bancomer is liable to Avia Mexico for materially breaching its agreement with Avia Mexico.

Bancomer agreed to retain certain of Avia Mexico's funds in a trust account and to disperse them

only when directed to do so by a committee of specified persons. Instead, among possibly other

things, Bancomer diverted, moved, or failed to pay Avia Mexico's funds as directed by the

committee. Bancomer's failures constituted material breaches of the agreement. The material

breaches caused Avia Mexico to suffer damages including but not necessarily limited to the loss of

its monies.

## Cause of Action Pursuant to the Texas Theft Liability Act

35.     In the alternative, without waiving any other cause of action of affirmative defense

herein, waiving any procedural, contractual, statutory, or common-law right, and incorporating all

other allegations herein to the extent they are not inconsistent with the cause of action pleaded here,

Dr. Navarro is liable to Mr. Musselman, Avia Mexico, and/or Avia USA/Mexico for violation of the

Texas Theft Liability Act. Dr. Navarro unlawfully appropriated monies, as described by the requisite

section(s) of the Texas Penal Code. Therefore, Dr. Navarro is liable for actual damages, statutory

damages, reasonable and necessary attorneys' fees and costs.

## Cause of Action for Monies had and Received

36.     In the alternative, without waiving any other cause of action of affirmative defense herein, waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein to the extent they are not inconsistent with the cause of action pleaded here, the Defendant(s) are liable to the Plaintiff(s) pursuant to the doctrine of "money had and received." The Defendant(s) hold money that in equity and good conscience belongs to the Plaintiff(s).

## Cause of Action for Declaratory Judgment

37.     In the alternative, without waiving any other cause of action pleaded herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein to the extent they are not inconsistent with the cause of action pleaded here, the court should sign a declaratory judgment confirming the Plaintiffs' rights and Defendants' obligations, including but not necessarily limited to those related to documents purportedly provided by Dr. Navarro to Bancomer and the extent Dr. Navarro's membership interest in Avia USA and/or Avia Mexico. The Plaintiff(s) also ask that the court, in conjunction with the declaratory judgment, award the Plaintiff(s) such costs and reasonable and necessary attorneys' fees as are equitable and just.

## Exemplary Damages

38.     Exemplary damages should be awarded against the Defendants because the harm with

respect to which the Plaintiff(s) seek recovery of exemplary damages resulted from malice, which

means that (a) there was a specific intent by the Defendants to cause substantial injury to the

Plaintiff(s) or (b) the Defendants' acts and/or omissions (i) when viewed objectively from the

Defendants' standpoint at the time of the acts and/or omissions involved an extreme degree of risk,

considering the probability and magnitude of potential harm to the Plaintiff(s) and (ii) were such that

the Defendants had an actual, subjective awareness of the risk of injury to the Plaintiff(s) and

nevertheless proceeded with conscious indifference to the rights, safety or welfare of the Plaintiff(s).

Attorneys' Fees

39.     The Defendant(s) are liable to the Plaintiff(s) for reasonable and necessary attorneys'

fees incurred by the Plaintiff(s) in this litigation for all causes of action supporting an award of

attorneys' fees.

Joint and Several Liability

40.     The Defendants' acts caused indivisible damages to the Plaintiffs and/or, upon

information and belief, the Defendants conspired to cause the Plaintiffs' damages.  Therefore, the

Defendants are jointly and severally liable for the damages caused by their tortious acts.

Request for a Temporary Restraining Order

41.     In the alternative, without waiving any other cause of action pleaded herein, and

incorporating all other allegations herein to the extent they are not inconsistent with the relief

requested here, the Plaintiffs are entitled to a temporary restraining order.  Immediate irreparable

injury, loss, and damage will occur to the Plaintiffs before a hearing can be had for a temporary restraining order. The irreparable injury, loss, and damage includes but is not necessarily limited to to the loss of the $2,731,229.68 forever, the inability to pay creditors, the likelihood of additional judgments against one or more Plaintiffs (which one or more such Plaintiffs would be financially unable to pay), and the likelihood that one or more Plaintiffs would be forced to file bankruptcy. Further, if Mr. Musselman is unable to coordinate payment of Avia USA/Mexico's creditors, then his reputation, and therefore his ability to effectively make a living, may be damaged beyond repair.

42.    The Plaintiffs further ask that the court set bond no more than $5,000.00, or in the alternative, a reasonable amount.

43.    In support of this request for a temporary restraining order, the affidavit of James C. Musselman is attached hereto as Exhibit A and incorporated by reference as if fully set forth herein.

## Request for a Temporary Injunction

44.    In the alternative, without waiving any other cause of action pleaded herein, and incorporating all other allegations herein to the extent they are not inconsistent with the relief requested here, after notice and hearing, the Plaintiffs request that the court sign a temporary injunction prohibiting, restraining, and enjoining all of the conduct described in the request for a temporary restraining order above for the duration of this suit.

## Request for a Permanent Injunction

45.    In the alternative, without waiving any other cause of action pleaded herein, and incorporating all other allegations herein to the extent they are not inconsistent with the relief

requested here, after trial of this suit, the Plaintiffs request that the court sign a permanent injunction

prohibiting all of the conduct described in the request for a temporary restraining order above.

## Conditions Precedent

46.    All conditions precedent related to the Plaintiffs' claims have been performed or have

occurred as required by law.

## Jury Demand

47.    The Plaintiffs hereby demand a jury trial and pay the appropriate fee.

## Prayer

48.    Premises considered, the Plaintiffs ask that the court, in accordance with this

pleading, sign a temporary restraining order, sign a temporary injunction, and after final trial, sign

and enter a judgment within the court's jurisdictional limits against the Defendants jointly and

severally, including a permanent injunction, for:

    a.    Damages pursuant to the Plaintiffs' breach of fiduciary duty cause of action;

    b.    Damages and/or the return of Plaintiffs' monies pursuant to the Plaintiffs'

conversion causes of action;

    c.    Damages pursuant to the Plaintiff's negligence cause of action;

    d.    Damages pursuant to the Plaintiffs' breach of contract cause of action;

e.      Damages pursuant to the Plaintiffs' Texas Theft Liability Act cause of action;

f.      Damages pursuant to the Plaintiffs' monies had and received cause of action;

g.      A constructive trust;

h.      Exemplary damages;

i.      Reasonable and necessary attorneys' fees and costs;

j.      The maximum pre-judgment and post-judgment interest allowed by law; and

k.      All other relief, legal and equitable, general and special, to which the Plaintiffs

are entitled.

Respectfully submitted,

Law Offices of Dean Malone, P.C.

T. Dean Malone
Texas State Bar No. 24003265
Michael T. O'Connor
Texas State Bar No. 24032922
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:      (214) 670-9904
Attorneys for the Plaintiffs

CAUSE NO. _____

| | | |
|---|---|---|
| AVIA ENERGY DEVELOPMENT, LLC; AVIA DE MEXICO S. DE R.L. DE C.V.; AND JAMES C. MUSSELMAN, | § § § | IN THE DISTRICT COURT |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| CARLOS FRANCISCO NAVARRO AND BBVA BANCOMER, S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO BBVA BANCOMER, | § § § § | |
| | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

### Affidavit of James C. Musselman

The State of Texas,

County of Dallas,

Before me, the undersigned Notary Public in and for the State of Texas, on this day personally appeared James Claude Musselman (hereinafter "Affiant"), who is personally known to me to be the person whose name is subscribed to this instrument, and he acknowledged to me that he executed the same for the purposes and consideration herein expressed, and after I administered an oath to him, upon his oath, said:

"I am competent and capable to make this affidavit, which I make of my own personal knowledge, and I affirm that the facts stated in it are true and correct. I am older than twenty-one years of age and am of sound mind. My name is James Claude Musselman. I am a member of and own a fifty percent (50%) interest in Avia Energy Development, L.L.C. ('Avia U.S.A.') and Avia de Mexico S. De R.L. de C.V. ('Avia Mexico'), and make this affidavit in that capacity for the purposes

Affidavit of James C. Musselman - Page 1

EXHIBIT

tabbies'

A

of obtaining a temporary restraining order in the suit with the style shown at the top of the first page of this affidavit (hereinafter the 'Lawsuit').

On February 18, 1998, a contract, with a total value of ninety-million U.S. dollars ($90,000,000.00) was awarded by PEMEX to Construcciones Protexa (COPROSA) to drill 38 natural gas wells in Northern Mexico's Burgos Basin. This contract was supported by an alliance of American and Mexican companies, the American companies being organized by Avia Energy Development, LLC of Dallas, Texas.

COPROSA and Avia Mexico (a wholly-owned subsidiary of Avia USA) formed a joint venture to carry out the PEMEX contract. The American and Mexican subcontractors executed agreements to provide their specific services in accordance with the PEMEX contract. There were several American investors in Avia: Hicks, Muse, Furst & Tate of Dallas, Texas; Michael Petroleum Corporation of Houston, Texas, and I (necessary front-end capital).

The American Alliance companies were:

BJ Services Company, Houston, Texas - Cementing and fracturing

Baker Hughes Inteq, Houston, Texas - Directional drilling

Computalog USA, Inc., Ft. Worth, Texas - Logging and perforating

Camco/Reed Tools, Houston, Texas - Drill bits

Norton Drilling Company, Lubbock, Texas - Drilling rigs

Vinson Supply Company, Dallas, Texas - Tubular goods

Kvaerner, Houston, Texas - Wellhead

Global Oil Tool, Houston, Texas - valves and fittings

The project officially was initiated on March 6, 1998, with the first well to begin on April

Affidavit of James C. Musselman - Page 2

15, 1998. Due to numerous delays in PEMEX obtaining land owner approval for locations, the original drilling contractors' unwillingness to accept country risk, and other bureaucratic and logistical delays, the initial well was not begun until June 17, 1998. The Project had further delays due to the logistics of moving the infrastructure of American drilling operations to Mexico. Permits for drilling equipment, logging trucks, pipe, and other equipment took much longer than anticipated. Though it was understood that PEMEX was providing assistance to other drilling groups (Schlumberger and Halliburton), we were informed by PEMEX that it refused to provide help in moving this equipment into Mexico. COPROSA, Avia USA/Mexico, and Avia USA/Mexico investors had invested five-million dollars ($5,000,000.00) in start-up capital for, among other things, the purchase of PEMEX vehicles, remodeling PEMEX offices, and providing PEMEX with furniture, computers, and other office equipment

In June, 1998, two drilling rigs owned by Norton Drilling Company were imported from the United States to initiate the drilling of the natural gas wells. Due to the delays, and the desire of COPROSA and Avia to drill the wells faster and with the approval of PEMEX, a third rig was imported in October, 1998. By this date, the project had mobilized to the project location in Mexico in excess of thirty-million U.S. dollars ($30,000,000.00) worth of American equipment plus the operating and support manpower. All the subcontractors had established offices in Mexico, hiring local help to support their operations.

Fourteen wells were expected to be finished by December 31, 1998. However, due to all of the above delays, only six wells were completed in the first seven months. Nevertheless, with the addition of the third drilling rig, and most other equipment and services now being in Mexico, six additional wells were drilled and completed in the next forty-five days.

Affidavit of James C. Musselman - Page 3

Unfortunately, on February 10, 1999, PEMEX chose to terminate this contract due to numerous problems outside this project with Grupo Protexa ('Protexa'), the parent company of COPROSA. There were numerous delays and roadblocks put up by PEMEX. This had a detrimental effect on the performance and progress of the project, all directed at attempting to cause COPROSA to somehow default on the contract. There were three additional contractors that performed work under similar agreements in the Burgos Basin. All had similar problems with initial logistics and organization, and all have missed numerous critical dates in their contracts. PEMEX did not cancel any of their arrangements.

Payments made under the contract with PEMEX were assigned to a "fideicomiso," or trust, at BBVA Bancomer, S.A., Institucion de Banca Multiple, Grupo Financiero BBVA Bancomer, Inc. ('Bancomer') to allow for the direct payment to the subcontractors. Five payments were made for the six initial wells. Pemex refused to pay approximately sixteen-million dollars ($16,000,000.00) due to Protexa and the American Alliance for completed wells accepted by Pemex.

The Alliance Companies attempted to reach an amicable settlement with Pemex for the monies owed. This effort went on for over two years. Finally, as required by the Pemex contract, Protexa, on behalf of the American Alliance, filed for arbitration with the International Court of Arbitration. In the first quarter of 2002, the International Court of Arbitration ruled in favor of Protexa and the American Alliance. Pemex disputed the result for the remainder of the year, but finally agreed in early 2003 to a payment of $16,859,000.00.

These monies were deposited in the Fideiocomiso (trust) account at Bancomer. Payments were made to all parties interested pursuant to instructions sent to the Trustee by the Technical Committee, a panel of four appointed when the trust was established. The instructions given by the

technical committee to the trustee were very explicit: Company Name, Amount, Wiring Instructions

to a specific bank account of the given company, all supported by an invoice that showed that all

Mexican taxes had been paid. Avia USA, through Avia Mexico, was to be paid two-million seven-

hundred thirty-one thousand two-hundred twenty-nine dollars and sixty-eight cents ($2,731,229.68).

I submitted all the documents needed, along with wiring instructions, to the Trustee.

On January 31, 2003, I went to Bancomer's office in Monterrey, Mexico, and I was informed

that the wiring instructions for the $2,731,299.68 had been changed such that the money was to be

wired to another account. Jack Lafield, a shareholder of Avia USA/Mexico and a member of the

Technical Committee, had gone to Monterrey on January 29, 2003 and instructed the Trustee to

change the wiring instructions. When I confronted Mr. Lafield, he informed me that Dr. Carlos

Francisco Navarro ('Dr. Navarro') of Dallas, Texas, a member of Avia USA/Mexico, had offered him

$50,000.00 to go to Monterrey and change the wiring instructions for the $2,731,229.68. Mr. Lafield

returned to Monterrey on February 6, 2003, met again with the Trustee, and withdrew his previous

wiring instructions. Mr. Lafield and I, as the only legal representatives of Avia on the Technical

Committee, reaffirmed the previous instructions that I had given the Trustee the previous week.

I was then informed by the Trustee that I did not have the proper Mexican invoice for the

money to be wired. As this was merely a return of capital that had been put into the company, and

not payment for services rendered, we were of the opinion that no invoice was necessary. I, as Avia

USA/Mexico's legal representative, have been attempting to secure an official invoice form for the

past two months. Avia retained KPMG in Mexico City to assist in the matter, and we were hopeful

that the invoices would be available by mid-April. No progress was made by the Mexican officials

at that point.

Affidavit of James C. Musselman - Page 5

On April 9, 2003, I was informed by Protexa that Dr. Navarro, alleging to be the 'legal representative' of Avia, had filed a purportedly proper invoice with the Trustee and had the $2,731,229.68 wired to an account in the name of Avia Mexico. I have asked the Trustee to forward to me the documents upon which he based his decision to move the money out of the trust into the account of Dr. Navarro, but to date these documents have not been forwarded. I have called Dr. Navarro repeatedly, but to date he has not returned my phone calls.

The initial ownership of Avia USA/Mexico was as follows:

James C. Musselman   60%

Jack Lafield         20%

John Hughett         20%

I agreed to fund the companies initially, and all agreed that I would be paid back any monies that I had advanced before any money would be paid to either Mr. Lafield or Mr. Hughett. I advanced approximately $400,000.00 in initial money, and then I guaranteed a bank line with the First National Bank of Albany for $900,000.00. The bank is still owed by Avia USA approximately $450,000.00. Since the contract was cancelled by Pemex in February 1999, I have personally spent well in excess of $100,000.00 for legal fees, travel, and other miscellaneous expenses on behalf of Avia USA/Mexico. I have spent the past few years trying to get all the Alliance Companies paid monies they were owed.

In the fall of 1999, Avia was running short of working capital due to the initial delays referenced before. I asked two friends to invest in the venture in order to get us though the start-up crunch. Tom Hicks invested $1,500,000.00 and Jack Furst invested $500,000.00, in the form of a note with a 12% coupon, coupled with a 10% net profits interests in Avia Mexico's joint venture

with Protexa in the Pemex contract. This money was funded in September of 1998. Additional debt, in the amount of $1,000,000.00 was provided by Michael's Petroleum around November 1998. This debt was junior to the First National Bank of Albany debt and the Hicks and Furst note. Dr. Navarro approached me in September or October of 1998 and requested and agreed to purchase a 10% interest in Avia USA/Mexico. We agreed on a price of $200,000.00, and the transaction was consummated. Dr. Navarro alleges that he subsequently purchased Mr. Hughett's and Mr. Lafield's interests in Avia USA/Mexico. I was never informed of these transactions, nor did I ever approve of the transactions. Pursuant to the agreement between myself, Mr. Lafield, and Mr. Hughett, no transfers could be made without my written consent. A true and correct copy of that agreement is attached hereto as Exhibit B and incorporated by reference as if fully set forth herein. Further, Mr. Hughett recently told me that Dr. Navarro never consummated his purchase of Mr. Hughett's interest.

I have acted as the legal (and in most cases only) representatives of Avia USA/Mexico for the past five years. The members of the Alliance Companies, Technical Committee, and Protexa would acknowledge that I have been the President and CEO of Avia USA/Mexico. Dr. Navarro never provided any significant assistance in operating Avia USA/Mexico, but rather appeared to be interested in the entities only when he thought he would be able to quickly obtain monies from one or both. I represented Avia USA/Mexico in the above-described arbitration process (and funded Avia's portion of the costs for the arbitration) and four separate lawsuits by creditors of Avia. Avia USA currently has unpaid judgments against it. True and correct copies of two such judgments are attached hereto respectively as Exhibits C and D. I am personally owed $618,659.00 by Avia. The judgments under appeal total approximately $520,075.00, and the secured debt totals $3,450,000.00. Therefore, Avia's liabilities total approximately $4,588,734.00.

Affidavit of James C. Musselman - Page 7

The liabilities of Avia are more than double the only asset of Avia, namely the $2,731,229.68 that Dr. Navarro improperly divested to his account in Bancomer. My intent was to pay those monies to Avia's creditors, excluding me personally. I am not seeking any money from Avia USA or Avia Mexico.

Dr. Navarro has asserted in previous conversations (in February, 2003 [after his previous attempt to improperly divert the money]) that he, as a common member of Avia, is due some of the $2,731,229.68. I spent several hours explaining the financial situation described above to an advisor of Dr. Navarro, and then another several hours with lawyers for Dr. Navarro in February, 2003. They all understood that there is no equity value for the Avia members.

Dr. Navarro now asserts that he is the owner of Avia Mexico, and that disbursement of the monies is a Mexican matter. Avia Mexico is a wholly-owned subsidiary of Avia USA. At best, Dr. Navarro could theoretically only own 50% of both companies, but because there was no consent given by me to the transfer of the membership interests to him, then he owns only 10% of both companies.

Dr. Navarro showed no interest in the companies when the companies were being sued or were being called to fund litigation and arbitration expenses. Dr. Navarro has only now come forward to date when there is $2,731,229.68 in a bank account in a country where he feels that he can create strategic leverage.

I am asking the court to sign a temporary restraining order in the Lawsuit, and ultimately a temporary and permanent injunctions, prohibiting the Defendants from doing the things described in the attached Plaintiffs' Original Petition and the request for a temporary restraining order section. The Defendants should not be allowed to convert, divert, spend, waste, or otherwise utilize the

Affidavit of James C. Musselman - Page 8

$2,731,229.68 until further order of the court. If the court does not immediately sign a temporary restraining order and further issue the other injunctions, I and the other Plaintiffs shall suffer irreparable harm and injury. That irreparable harm and injury includes the loss of the $2,731,229.68 forever, the inability to pay creditors, the likelihood of additional judgments against one or more Plaintiffs (which one or more such Plaintiffs would be financially unable to pay), and the likelihood that one or more Plaintiffs would be forced to file bankruptcy. Further, if I am unable to coordinate, as described above, payment of Avia USA/Mexico's creditors, then my reputation, and therefore my ability to effectively make a living, may be damaged upon repair."

FURTHER AFFIANT SAYETH NOT.

_James C. Musselman_
Affiant

Given under my hand and seal of office this ____14th____ day of

__April__, A.D., __2003__.

_Margaret M. Gorman_
Notary Public in and for the State of Texas

Affidavit of James C. Musselman - Page 9



# REGULATIONS OF

# AVIA ENERGY DEVELOPMENT, L.L.C.

ENDAL:20730.1 11429-00009

EXHIBIT

B

REGULATIONS OF
AVIA ENERGY DEVELOPMENT, L.L.C.

## TABLE OF CONTENTS

ARTICLE I - DEFINED TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE II - ORGANIZATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Section 2.1.  Articles of Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 2.2.  Qualification in Other Jurisdictions . . . . . . . . . . . . . . . . . . . . 4
    Section 2.3.  Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 2.4.  Merger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 2.5.  No State Law Partnership . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARTICLE III - NAME; PLACE OF BUSINESS; REGISTERED OFFICE AND AGENT . . 4
    Section 3.1.  Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 3.2.  Assumed Names . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 3.3.  Registered Office; Registered Agent; Principal Office in the United States;
              Other Offices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARTICLE IV - PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE V - MEMBERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 5.1.  Initial Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 5.2.  Capital Contributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 5.3.  Admission of Additional Members. . . . . . . . . . . . . . . . . . . . 5
    Section 5.4.  Return of Capital Contributions. . . . . . . . . . . . . . . . . . . . . 5
    Section 5.5.  Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 5.6.  Loans From Members. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 5.7.  No Preemptive Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . .

ARTICLE VI - CAPITAL ACCOUNTS, ALLOCATIONS AND DISTRIBUTIONS . . . . 6
    Section 6.1.  Capital Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 6.2.  Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 6.3.  Allocations of Profit and Loss . . . . . . . . . . . . . . . . . . . . . . 6
    Section 6.4.  Minimum Gain Chargeback. . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 6.5.  Qualified Income Offset. . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 6.6.  Limitations on Loss Allocation. . . . . . . . . . . . . . . . . . . . . 7
    Section 6.7.  Curative Allocations. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 6.8.  Interest in Company Profits. . . . . . . . . . . . . . . . . . . . . . . 7
    Section 6.9.  Gross Income Allocation. . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 6.10.  Partner Nonrecourse Deductions . . . . . . . . . . . . . . . . . . . . . .
    Section 6.11.  Partner Nonrecourse Minimum Gain Chargeback . . . . . . . . . . . . . 8

ARTICLE VII - OWNERSHIP OF COMPANY PROPERTY . . . . . . . . . . . . . . . . . . . 8

ARTICLE VIII - FISCAL MATTERS; BOOKS AND RECORDS . . . . . . . . . . . . . . . . 8
    Section 8.1.    Bank Accounts; Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 8.2.    Books and Records of Account . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 8.3.    Tax Returns and Information . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 8.4.    Audits at Request of Member . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 8.5.    Fiscal Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 8.6.    Tax Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 8.7.    Tax Matters Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE IX - MANAGEMENT OF THE COMPANY . . . . . . . . . . . . . . . . . . . . 9
    Section 9.1.    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 9.2.    Powers of Members. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 9.3.    Officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 9.4.    Outside Activities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 9.5.    Liability to Third Parties . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE X - ASSIGNMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 10.1.   Limitation on Transfer of Membership Interests . . . . . . . . . . . . . 10
    Section 10.2.   Additional Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Section 10.3.   Related Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE XI - DISSOLUTION AND WINDING UP . . . . . . . . . . . . . . . . . . . . . 11
    Section 11.1.   Dissolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Section 11.2.   Liquidation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Section 11.3.   Deficit Capital Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARTICLE XII - MISCELLANEOUS PROVISIONS . . . . . . . . . . . . . . . . . . . . . . 12
    Section 12.1.   Notices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 12.2.   Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 12.3.   Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 12.4.   Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 12.5.   Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 12.6.   Offset . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 12.7.   Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Section 12.8.   Execution in Writing . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Exhibit A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# REGULATIONS OF
## AVIA ENERGY DEVELOPMENT, L.L.C.

### June 12, 1997

THESE REGULATIONS OF AVIA ENERGY DEVELOPMENT, L.L.C., a Texas limited liability company (the "Company"), are adopted effective as of the date set forth above by the undersigned Members of the Company.

## ARTICLE I

## DEFINED TERMS

The capitalized terms used in these Regulations shall, unless the context otherwise requires, have the meanings specified in this Article I.

*Act* means the Texas Limited Liability Company Act, as it may be amended from time to time, and any successor to such Act. References to the Act shall also include the Texas Business Corporation Act, as it may be amended from time to time, and any successor to such act (the "TBCA"), and the Texas Miscellaneous Corporation Laws Act, as it may be amended from time to time, and any successor to such act (the "TMCLA"), to the extent the TBCA and/or the TMCLA are made applicable to limited liability companies by the Act.

*Adjusted Capital Account* means a Capital Account determined and maintained for each Member throughout the term of these Regulations, the balance of which shall be equal to such Member's Capital Account balance, modified as follows:

(a)    increased by the amount, if any, of such Member's share of the Minimum Gain of the Company as determined under Section 1.704-2(g)(1) of the Treasury Regulations;

(b)    increased by the amount, if any, of such Member's share of the Minimum Gain attributable to Partner Nonrecourse Debt of the Company pursuant to Section 1.704-2(i)(5) of the Treasury Regulations;

(c)    increased by the amount, if any, of such Member's share of the Member's Modified 752 Share of Recourse Debt;

(d)    increased by the amount, if any, that such Member is treated as being obligated to contribute subsequently to the capital of the Company as determined under Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations;

(e)    decreased by the amount, if any, of cash that is reasonably expected to be distributed to such Member, but only to the extent that the amount thereof exceeds any offsetting increase in such Member's Capital Account that is reasonably expected to occur

during (or prior to) the tax year during which such distributions are reasonably expected to be made (as determined under Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations); and

(f)    decreased by the amount, if any, of loss and deduction that is reasonably expected to be allocated to such Member pursuant to Section 704(e)(2) or 706(d) of the Code, Section 1.751-1(b)(2)(ii) of the Treasury Regulations or Section 1.704-1(b)(2)(iv)(k) of the Treasury Regulations.

*Available Cash* means all cash funds of the Company on hand from operations after payment or provision for payment of current and anticipated Company obligations and expenditures and provision for adequate reserves in the discretion of the Members. Available Cash shall not include any proceeds received from capital contributions or borrowings.

*Bankruptcy* of a Person means (a) the filing by such Person of an application for, or a consent to, the appointment of a trustee, receiver or liquidator for such Person's assets, (b) the filing by such Person of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing its inability to pay its debts as they come due, (c) the making by the Person of a general assignment for the benefit of creditors, (d) the filing by the person of an answer admitting or failing to contest the material allegations of, or its consenting to, or defaulting in answering a bankruptcy petition filed against it in, any bankruptcy proceeding, or (e) the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating the Person a bankrupt or insolvent or appointing a trustee, receiver or liquidator of its assets, and such order, judgment or decree continues unstayed and in effect for a period of 90 days.

*Capital Account* means an account maintained for each Member pursuant to Section 6.1 of these Regulations.

*Code* means the Internal Revenue Code of 1986, as amended.

COPY

## REGULATIONS OF

## AVIA ENERGY DEVELOPMENT, L.L.C.

ENDAL:28730.1 11429-00009

REGULATIONS OF
AVIA ENERGY DEVELOPMENT, L.L.C.

## TABLE OF CONTENTS

ARTICLE I - DEFINED TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE II - ORGANIZATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   Section 2.1.  Articles of Organization . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   Section 2.2.  Qualification in Other Jurisdictions . . . . . . . . . . . . . . . . . . . . . . . . 4
   Section 2.3.  Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   Section 2.4.  Merger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   Section 2.5.  No State Law Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARTICLE III - NAME; PLACE OF BUSINESS; REGISTERED OFFICE AND AGENT . . 4
   Section 3.1.  Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   Section 3.2.  Assumed Names . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   Section 3.3.  Registered Office; Registered Agent; Principal Office in the United States;
             Other Offices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARTICLE IV - PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE V - MEMBERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   Section 5.1.  Initial Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   Section 5.2.  Capital Contributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   Section 5.3.  Admission of Additional Members. . . . . . . . . . . . . . . . . . . . . . . . 5
   Section 5.4.  Return of Capital Contributions. . . . . . . . . . . . . . . . . . . . . . . . . 5
   Section 5.5.  Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   Section 5.6.  Loans From Members. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   Section 5.7.  No Preemptive Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE VI - CAPITAL ACCOUNTS, ALLOCATIONS AND DISTRIBUTIONS . . . . . 6
   Section 6.1.  Capital Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   Section 6.2.  Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   Section 6.3.  Allocations of Profit and Loss . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   Section 6.4.  Minimum Gain Chargeback. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   Section 6.5.  Qualified Income Offset. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   Section 6.6.  Limitations on Loss Allocation. . . . . . . . . . . . . . . . . . . . . . . . . . 7
   Section 6.7.  Curative Allocations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   Section 6.8.  Interest in Company Profits. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   Section 6.9.  Gross Income Allocation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   Section 6.10.  Partner Nonrecourse Deductions . . . . . . . . . . . . . . . . . . . . . . . . 7
   Section 6.11.  Partner Nonrecourse Minimum Gain Chargeback . . . . . . . . . . . . . . 8

ARTICLE VII - OWNERSHIP OF COMPANY PROPERTY . . . . . . . . . . . . . . . . . . . 8

ARTICLE VIII - FISCAL MATTERS; BOOKS AND RECORDS . . . . . . . . . . . . . . . . 8
    Section 8.1.    Bank Accounts; Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 8.2.    Books and Records of Account . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 8.3.    Tax Returns and Information . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 8.4.    Audits at Request of Member . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 8.5.    Fiscal Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 8.6.    Tax Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 8.7.    Tax Matters Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE IX - MANAGEMENT OF THE COMPANY . . . . . . . . . . . . . . . . . . . . . 9
    Section 9.1.    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 9.2.    Powers of Members. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 9.3.    Officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 9.4.    Outside Activities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 9.5.    Liability to Third Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE X - ASSIGNMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 10.1.   Limitation on Transfer of Membership Interests . . . . . . . . . . . . . . 10
    Section 10.2.   Additional Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Section 10.3.   Related Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE XI - DISSOLUTION AND WINDING UP . . . . . . . . . . . . . . . . . . . . . 11
    Section 11.1.   Dissolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Section 11.2.   Liquidation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Section 11.3.   Deficit Capital Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARTICLE XII - MISCELLANEOUS PROVISIONS . . . . . . . . . . . . . . . . . . . . . . 12
    Section 12.1.   Notices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Section 12.2.   Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 12.3.   Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 12.4.   Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 12.5.   Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 12.6.   Offset . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 12.7.   Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 12.8.   Execution in Writing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Exhibit A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# REGULATIONS OF
## AVIA ENERGY DEVELOPMENT, L.L.C.

### June 12, 1997

THESE REGULATIONS OF AVIA ENERGY DEVELOPMENT, L.L.C., a Texas limited liability company (the "Company"), are adopted effective as of the date set forth above by the undersigned Members of the Company.

## ARTICLE I

## DEFINED TERMS

The capitalized terms used in these Regulations shall, unless the context otherwise requires, have the meanings specified in this Article I.

*Act* means the Texas Limited Liability Company Act, as it may be amended from time to time, and any successor to such Act. References to the Act shall also include the Texas Business Corporation Act, as it may be amended from time to time, and any successor to such act (the "TBCA"), and the Texas Miscellaneous Corporation Laws Act, as it may be amended from time to time, and any successor to such act (the "TMCLA"), to the extent the TBCA and/or the TMCLA are made applicable to limited liability companies by the Act.

*Adjusted Capital Account* means a Capital Account determined and maintained for each Member throughout the term of these Regulations, the balance of which shall be equal to such Member's Capital Account balance, modified as follows:

   (a)    increased by the amount, if any, of such Member's share of the Minimum Gain of the Company as determined under Section 1.704-2(g)(1) of the Treasury Regulations;

   (b)    increased by the amount, if any, of such Member's share of the Minimum Gain attributable to Partner Nonrecourse Debt of the Company pursuant to Section 1.704-2(i)(5) of the Treasury Regulations;

   (c)    increased by the amount, if any, of such Member's share of the Member's Modified 752 Share of Recourse Debt;

   (d)    increased by the amount, if any, that such Member is treated as being obligated to contribute subsequently to the capital of the Company as determined under Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations;

   (e)    decreased by the amount, if any, of cash that is reasonably expected to be distributed to such Member, but only to the extent that the amount thereof exceeds any offsetting increase in such Member's Capital Account that is reasonably expected to occur

during (or prior to) the tax year during which such distributions are reasonably expected to be made (as determined under Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations); and

(f)    decreased by the amount, if any, of loss and deduction that is reasonably expected to be allocated to such Member pursuant to Section 704(e)(2) or 706(d) of the Code, Section 1.751-1(b)(2)(ii) of the Treasury Regulations or Section 1.704-1(b)(2)(iv)(x) of the Treasury Regulations.

*Available Cash* means all cash funds of the Company on hand from operations after payment or provision for payment of current and anticipated Company obligations and expenditures and provision for adequate reserves in the discretion of the Members. Available Cash shall not include any proceeds received from capital contributions or borrowings.

*Bankruptcy* of a Person means (a) the filing by such Person of an application for, or a consent to, the appointment of a trustee, receiver or liquidator for such Person's assets, (b) the filing by such Person of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing its inability to pay its debts as they come due, (c) the making by the Person of a general assignment for the benefit of creditors, (d) the filing by the person of an answer admitting or failing to contest the material allegations of, or its consenting to, or defaulting in answering a bankruptcy petition filed against it in, any bankruptcy proceeding, or (e) the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating the Person a bankrupt or insolvent or appointing a trustee, receiver or liquidator of its assets, and such order, judgment or decree continues unstayed and in effect for a period of 90 days.

*Capital Account* means an account maintained for each Member pursuant to Section 6.1 of these Regulations.

*Code* means the Internal Revenue Code of 1986, as amended.

*Company* means Avia Energy Development, L.L.C., a Texas limited liability company.

*Company Assets* means all interests, properties and rights of any kind owned by the Company.

*Exhibit A* means Exhibit A attached to these Regulations and made a part hereof for all purposes.

*Interest* means all rights and interests of a Member in the Company under these Regulations and the Act, including (a) the right of a Member, expressed as a percentage on Exhibit A, to receive allocations of income and loss and distributions of Available Cash or liquidation proceeds under these Regulations and (b) all management rights, voting rights or rights to consent.

*Members* means at any time, the Persons who then own Interests in the Company. The initial Members are listed on Exhibit A.

*Minimum Gain* means the amount determined by computing with respect to each Nonrecourse Liability of the Company the amount of gain, if any, that would be realized by the Company if it disposed of the property securing such liability in full satisfaction thereof, and by then aggregating the amounts so computed.

*Modified 752 Share of Recourse Debt* means, as of any date, the amount (if any) of the economic risk that a Partner is treated, as of such date, as bearing under Section 1.752-2 of the Treasury Regulations with respect to recourse debt (i.e., debt of the company which is not Partner Nonrecourse Debt or a Nonrecourse Liability).

*Nonrecourse Liability* means a liability (or that portion of a liability) with respect to which no Member bears the economic risk of loss as determined under Section 1.704-2(b)(3) of the Treasury Regulations.

*Partner Nonrecourse Debt* means any liability (or portion thereof) of the Company that constitutes debt which, by its terms, is nonrecourse to the Company and the Members, but for which a Member bears the economic risk of loss as determined under Section 1.704-2(b)(4) of the Treasury Regulations.

*Percentage Interest* means each Member's percentage interest in allocations of income and loss and distributions of Available Cash or liquidation proceeds under these Regulations. The Percentage Interests of the Members are shown on Exhibit A.

*Person* means an individual or a corporation, partnership, limited liability company, trust or other entity.

*Section 705(a) (2) (B) Expenditure* means any expenditure of the Company described in Section 705(a)(2)(B) of the Code and any expenditure considered to be an expenditure described in Section 705 (a) (2) (B) of the Code pursuant to Section 704 (b) of the Code and the Treasury Regulations thereunder.

*Treasury Regulations* means the regulations promulgated by the U.S. Treasury Department pursuant to the Code.

## ARTICLE II

## ORGANIZATION

*Section 2.1.    Articles of Organization.* Articles of Organization for the Company were filed with, and a Certificate of Organization was issued by, the Secretary of State of the State of Texas on March 14, 1997.

**Section 2.2.** *Qualification in Other Jurisdictions.* The Members shall have authority to cause the Company to do business in a jurisdiction other than the State of Texas only if one of the following conditions is satisfied:

(a)    Such jurisdiction has enacted a limited liability company statute, and the Company shall have qualified under such statute to do business as a foreign limited liability company in such jurisdiction; or

(b)    The Company has obtained an opinion of counsel qualified to practice law in such jurisdiction to the effect that under the laws of such jurisdiction the Members will not be held liable for any debts or obligations of the Company.

**Section 2.3.** *Term.* Pursuant to the Act, the existence of the Company began upon the date of issuance of the Certificate of Organization and shall continue until terminated in accordance with these Regulations and the Act.

**Section 2.4.** *Merger.* The Company may merge with or into another limited liability company or other entity, or enter into an agreement to do so, subject to the requirements of the Act and Section 9.1.

**Section 2.5.** *No State Law Partnership.* No provisions of these Regulations shall be deemed or construed to constitute the Company a partnership or any Member a partner of any other Member for any purposes other than federal and state tax purposes.

## ARTICLE III

## NAME; PLACE OF BUSINESS; REGISTERED OFFICE AND AGENT

**Section 3.1.** *Name.* The name of the Company is "Avia Energy Development, L.L.C."

**Section 3.2.** *Assumed Names.* The Members may cause the Company to do business under one or more assumed names. In connection with the use of any such assumed names, the Members shall cause the Company to comply with all applicable assumed name statutes.

**Section 3.3.** *Registered Office; Registered Agent; Principal Office in the United States; Other Offices.* The registered office of the Company required by the Act to be maintained in the State of Texas shall be the registered office named in the Articles of Organization of the Company or such other office (which need not be a place of business of the Company) as the Members may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the registered agent named in the Articles of Organization of the Company or such other Person or Persons as the Members may designate from time to time in the manner provided by law. The principal office of the Company shall be located at 200 Crescent Court, Suite 1375, Dallas, Texas 75201 or such other location as the Members may designate

from time to time.  The Company may have such other offices as the Members may designate from time to time.

## ARTICLE IV

## PURPOSE

The purpose of the Company is to engage in any lawful activity or business for which limited liability companies may be organized under the Act.

## ARTICLE V

## MEMBERS

**Section 5.1.** *Initial Members.* The initial Members of the Company and their Percentage Interests in the Company are shown on Exhibit A.

**Section 5.2.** *Capital Contributions.* Each Member shall make such capital contributions to the Company as may be required by unanimous agreement of the Members.

**Section 5.3.** *Admission of Additional Members.* Additional Members of the Company may be admitted only with the prior written approval of sixty-six and two-thirds percent (66⅔%) in Percentage Interest of the Members.

**Section 5.4.** *Return of Capital Contributions.* Except as otherwise provided herein or in the Act, no Member shall have any right to withdraw any part of his capital contribution to the Company or his Capital Account or to receive any distribution from the Company.

**Section 5.5.** *Interest.* No interest shall be paid by the Company on capital contributions or on balances in Members' Capital Accounts.

**Section 5.6.** *Loans From Members.* The Members may lend money to the Company from time to time ("Member Loans").  Member Loans will be evidenced by separate promissory notes executed and delivered by the Company.  Member Loans shall not be considered capital contributions and shall bear interest until repaid at the rate of ten percent (10%) per annum or at such other rate as may be agreed to by the lending Member and sixty-six and two-thirds percent (66⅔%) in Percentage Interest of all Members.  Payments of principal and interest on any Member Loans shall not be considered distributions.

**Section 5.7.** *No Preemptive Rights.* No Member shall have any preemptive, preferential or other right with respect to (a) additional capital contributions to the Company, (b) the issuance or sale of interests in the Company, (c) the issuance of any obligations, evidences of indebtedness or other securities of the Company convertible into or exchangeable for, or carrying or

accompanied by any rights to receive, purchase or subscribe for any interest in the Company, (d) the issuance of any rights, options or warrants for the purchase of any of the foregoing or (e) the issuance or sale of any other securities that may be issued or sold by the Company.

## ARTICLE VI

## CAPITAL ACCOUNTS, ALLOCATIONS AND DISTRIBUTIONS

*Section 6.1.  Capital Accounts.*  A Capital Account shall be maintained for each Member in accordance with the capital accounting rules of Section 1.704-1(b)(2)(iv) of the Treasury Regulations.  A Member's Capital Account shall be (i) increased by (A) any cash contributions (but not loans) made by such Member to the Company, (B) the fair market value of any property contributed by such Member to the Company (net of liabilities secured by such property that the Company is considered to assume or take subject to under Section 752 of the Code), and (C) the amount of any income or gain (or items thereof), including income and gain exempt from taxation, allocated to such Member for federal income tax purposes; and (ii) reduced by (A) the amount of any distributions of cash (but not any payment of interest or principal on loans made to the Company) made to such Member by the Company, (B) the fair market value of any property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code), (C) the amount of any Section 705(a)(2)(B) Expenditure allocated to such Member for federal income tax purposes and (D) the amount of any loss or deduction (or item thereof) allocated to such Member for federal income tax purposes.

*Section 6.2.  Distributions.*  The Company will make distributions of Available Cash at such times and in such amounts as shall be determined by sixty-six and two-thirds percent (66⅔%) in Percentage Interest of the Members; provided that no distributions will be made while there are any outstanding Member Loans.  All distributions shall be made to the Members in proportion to their Percentage Interests.

*Section 6.3.  Allocations of Profit and Loss.*  Except as otherwise required by Sections 6.4 through 6.9, all income, gain, loss and deduction shall be allocated among the Members in proportion to their Percentage Interests and, subject to Section 704(c) of the Code and Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations, all federal income tax items of income, gain, loss and deduction shall be allocated among the Members in proportion to their Percentage Interests.

*Section 6.4.  Minimum Gain Chargeback.*  Notwithstanding any other provision in these Regulations, if in any fiscal year there is a net decrease in the amount of the Company's Minimum Gain, or in the Minimum Gain that would result if Partner Nonrecourse Debt were treated as a Nonrecourse Liability of the Company, then, prior to any other allocation pursuant to this Article VI, each Member shall be allocated items of income and gain (including gross income) for such fiscal year (and, if necessary, for subsequent years) to the extent and in the manner provided in Sections 1.704-2(f) and (i)(4) of the Treasury Regulations.  This Section is intended to satisfy the provisions of Section 1.704-2(f) and (i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

**Section 6.5.** *Qualified Income Offset.* Pursuant to Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations, income of the Company shall be allocated (after the allocations required by Section 6.4 regarding minimum gain chargeback and Section 6.11 regarding minimum gain chargeback for Partner Nonrecourse Debt but before any other allocation required by this Article VI) to the Members with deficit balances in their Adjusted Capital Accounts in an amount and in a manner sufficient to eliminate such deficit balances as quickly as possible; provided, however, that an allocation shall be made pursuant to this Section 6.5 only if and to the extent that such Member would have a deficit balance in his Adjusted Capital Account after all allocations in this Article VI have been tentatively made as if Section 6.5 were not in the Regulations. This Section 6.5 is intended to satisfy the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

**Section 6.6.** *Limitations on Loss Allocation.* Notwithstanding any other provision of these Regulations to the contrary (other than Sections 6.4 and 6.5), no item of loss or deduction of the Company shall be allocated to a Member if such allocation would result in a negative balance in such Member's Adjusted Capital Account. Such loss or deduction shall be allocated among the Members in accordance with their membership interests as determined under Section 1.704-1(b)(3) of the Treasury Regulations.

**Section 6.7.** *Curative Allocations.* If any items of income and gain (including gross income) or loss, deduction and Section 705(a)(2)(B) Expenditures are allocated to a Member pursuant to Sections 6.4 through 6.9, then, prior to any allocation pursuant to Section 6.3 and subject to Sections 6.4 through 6.9, items of income and gain (including gross income) and items of loss, deduction and Section 705(a)(2)(B) Expenditures for subsequent periods shall be allocated to the Members in a manner designed to result in each Member's Adjusted Capital Account having a balance equal to what it would have been had such allocation of items of income and gain (including gross income) or loss, deduction and Section 705(a)(2)(B) Expenditures not occurred under Sections 6.4 through 6.9.

**Section 6.8.** *Interest in Company Profits.* Pursuant to Section 1.752-3(a)(3) of the Regulations, the Members' interests in Company profits for purposes of determining the Members' proportionate shares of the excess nonrecourse liabilities (as defined in Section 1.752-3(a)(3) of the Treasury Regulations) of the Company shall be determined in accordance with their respective Percentage Interests.

**Section 6.9.** *Gross Income Allocation.* Subject to Sections 6.4 and 6.5, but before any other allocations required by this Article VI, each Member which has a negative balance in its Adjusted Capital Account at the end of any taxable year will be specially allocated items of Company income and gain in the amount of such negative balance as quickly as possible.

**Section 6.10.** *Partner Nonrecourse Deductions.* All deductions attributable to Partner Nonrecourse Debt shall be allocated among the Members bearing the economic risk of loss for such debt as determined under Treasury Regulation Section 1.704-2(b)(4); provided, however, that if more than one Member bears the economic risk of loss for such debt, the deductions attributable to such debt shall be allocated to and among the Members in the same proportion that

they bear the economic risk of loss for such debt. This Section 6.10 is intended to comply with the provision of Section 1.704-2(i) of the Treasury Regulations and shall be interpreted consistently therewith.

Section 6.11. *Partner Nonrecourse Minimum Gain Chargeback*. Notwithstanding any other provision in these Regulations (except for Section 6.4 regarding minimum gain chargeback), if in any fiscal year there is a net decrease in the amount of Minimum Gain (or if there was a net decrease in Minimum Gain for a prior fiscal year and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this Section 6.11), then, prior to any other allocation pursuant to this Article VI, items of income and gain (including gross income) shall be allocated to each Member for such fiscal year (and, if necessary, for subsequent years) in an amount equal to such Member's share of the net decrease in such Minimum Gain (as determined pursuant to Section 1.704-2(i)(4) of the Treasury Regulations). It is the intent of the Members that any allocation pursuant to this Section 6.11 shall constitute a "minimum gain chargeback" under Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

## ARTICLE VII

## OWNERSHIP OF COMPANY PROPERTY

Company Assets shall be deemed to be owned by the Company as an entity, and no Member shall have any ownership interest in Company Assets or any portion thereof. Title to any or all Company Assets may be held in the name of the Company or one or more nominees, as the Members may determine. All Company Assets shall be recorded as the property of the Company on its books and records, regardless of the name in which legal title to such Company Assets is held.

## ARTICLE VIII

## FISCAL MATTERS; BOOKS AND RECORDS

Section 8.1. *Bank Accounts; Investments*. Capital contributions, revenues and any other Company funds shall be deposited by the Members in a bank account established in the name of the Company, or shall be invested by the Members in furtherance of the purposes of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company Investments. Funds deposited in the Company's bank accounts may be withdrawn only to be expended or invested in furtherance of the Company's purposes, to pay Company debts or obligations or to be distributed to the Members pursuant to these Regulations.

Section 8.2. *Books and Records of Account*. The Members, at the expense of the Company, shall maintain for the Company adequate books and records of account that shall be maintained on a basis consistent with appropriate provisions of the Code, containing, among other entries, a Capital Account for each Member.

ENDAL:20730.1  11424-00009

8

**Section 8.3.    Tax Returns and Information.** The Members intend for the Company to be treated as a partnership for tax purposes only. The Members shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file. By March 31 of each calendar year, the Members shall send or deliver to each Person who was a Member at any time during the preceding calendar year such tax information as shall be reasonably necessary for the preparation by such Person of his federal income tax return and state income and other tax returns.

**Section 8.4.    Audits at Request of Member.** Any Member shall have the right to have an audit conducted of the Company books. The cost of the audit shall be borne by the Member or Members requesting that the audit be performed or, upon the approval of the Members, by the Company. The audit shall be performed by an accounting firm acceptable to the Members. Not more than one (1) audit shall be required by any or all of the Members for any fiscal year.

**Section 8.5.    Fiscal Year.** The fiscal year of the Company shall be the calendar year.

**Section 8.6.    Tax Elections.** The Company shall make such elections on the appropriate tax returns as the Members may deem appropriate and in the best interests of the Members; provided that neither the Company nor any Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law.

**Section 8.7.    Tax Matters Partner.** The Members shall designate one Member to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code. Such Member shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Code. Such Member shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth business day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Any member who is designated as "tax matters partner" may not take any action contemplated by Sections 6222 through 6232 of the Code without the consent of the other Members, and may not in any case take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Code.

## ARTICLE IX

## MANAGEMENT OF THE COMPANY

**Section 9.1.    Management.** The Members shall manage, direct and exercise full control over the business and affairs of the Company. Except as otherwise expressly provided in these Regulations, all actions and decisions of the Members shall require the approval of sixty-six and two-thirds percent (66⅔%) in Percentage Interest of the Members. The Members may make any decision or take any action at a meeting, by conference telephone call, by written consent, by oral agreement or by any other method they elect; provided that, at the request of any Member with

BNDAL:20730.1 11429-00009

respect to a decision or action, such decision or action must be made or taken by written consent signed by Members holding the Percentage Interests required to approve such decision or action.

Section 9.2.    Powers of Members.    Subject to Section 9.1, the Members shall have full authority to do all things they deem necessary or desirable to conduct the business of the Company, including without limitation the authority to enter into and perform contracts of all kinds, to lend or borrow money, to assume, guaranty or otherwise contract for indebtedness and other liabilities, to issue evidences of indebtedness and secure the same by mortgage, deed of trust or other lien or encumbrance, to prosecute, defend and settle actions at law or in equity, or in arbitration or administrative proceedings, to indemnify any person against liabilities and contingencies to the extent permitted by law, and to buy, own, manage, sell, lease, encumber or otherwise acquire or dispose of Company Assets.

Section 9.3.    Officers.    The Members may hire, appoint and discharge officers and employees on behalf of the Company (including Members or affiliates of Members) to assist in the management of the business and operations of the Company and may designate the authority, responsibilities, ranking, titles and compensation of such officers and employees.

Section 9.4.    Outside Activities.    A Member may have business interests and engage in business activities in addition to those relating to the Company, including without limitation interests and activities competitive with the Company. Neither the Company nor any of the other Members shall have any rights, by virtue of these Regulations or their status as Members of the Company, in any such other business interests or activities of any Member or in the income or profits therefrom.

Section 9.5.    Liability to Third Parties.    No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

## ARTICLE X

## ASSIGNMENT

Section 10.1.    Limitation on Transfer of Membership Interests.    No Member, nor his successors, transferees or assigns, shall directly or indirectly, voluntarily or involuntarily, sell, give, transfer, assign, pledge, encumber or otherwise dispose of all or any portion of his Interest in the Company without the prior written approval of sixty-six and two-thirds percent (66⅔%) in Percentage Interest of all Members. Notwithstanding that a Member shall have obtained the right to sell or otherwise dispose of any interest in the Company in any manner provided in this Article X, such sale or other disposition shall not be permitted until the purchaser, assignee, donee or transferee thereof agrees in writing to take and accept such interest subject to all of the restrictions, terms and conditions contained in these Regulations. The Company will not be required to recognize any permitted assignment of an interest until the instrument conveying such interest has been delivered to the Company. A permitted purchaser, assignee, donee or transferee of a Member shall have all of the rights and powers of, shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall succeed to the status of, its

10

DMDAL:267332.1  11429-00009

predecessor, and shall in all respects be a Member under these Regulations. The use of the term "Member" in these Regulations shall be deemed to include any such additional Members.

Section 10.2. *Additional Limitations.* Without limiting the right of the Members to approve or disapprove transfers of interests in the Company, any Member may require, as a condition to any transfer of an interest in the Company, evidence (including legal opinions) satisfactory to such Member in his sole discretion that (a) the transfer will not jeopardize the treatment of the Company as a partnership for federal income tax purposes or cause a termination of the Company under Section 708 of the Code, (b) the transfer will not violate any law or regulation applicable to the Company's business and (c) the transfer will not violate the registration requirements of applicable securities laws or cause any prior offer and sale of interests in the Company to violate such requirements.

Section 10.3. *Related Parties.* The provisions of Section 10.1 hereof shall not apply to any sale, gift or other disposition by an individual Member of any interest in the Company to the spouse or lineal descendants of such Member or to a trust whose only beneficiaries are such Member and/or one or more of the spouse or lineal descendants of such Member; provided that such transferee shall not thereby become a Member except in accordance with Section 10.4.

## ARTICLE XI

## DISSOLUTION AND WINDING UP

Section 11.1. *Dissolution.* The Company shall be dissolved upon the first of the following events to occur:

(a)    the written consent of sixty-six and two-thirds percent (66⅔%) in Percentage Interest of the Members at any time to dissolve and wind up the affairs of the Company;

(b)    the Bankruptcy of a Member, unless there is at least one remaining Member and the business of the Company is continued by the consent of all remaining Members; or

(c)    the entry of a decree of judicial dissolution of the Company under the Act.

The death or dissolution of a Member or, except as expressly provided in this Section 11.1, the occurrence of any other event which terminates the continued membership of a Member in the Company, shall not dissolve the Company.

Section 11.2. *Liquidation.*

(a)    Except as otherwise provided herein, upon the dissolution of the Company, unless it is reconstituted pursuant to the Act and these Regulations, no further business shall be conducted except for the taking of such action as shall be necessary for the

ENBAL:20730.1  11429-00009

11

winding up of the affairs of the Company and the distribution of its assets to the Members pursuant to the provisions of this Section. The Members shall have full authority to wind up the affairs of the Company and to make final distribution as provided herein; provided, however, if the Company is dissolved for any reason set forth in Section 11.1(b), the Members other than the Member to whom Section 11.1(b) applies shall have such authority.

(b)    Upon a dissolution of the Company requiring the winding up of its affairs, unless it is reconstituted pursuant to the Act and these Regulations, the Members may sell the Company Assets at the best price available or may distribute those assets in kind. All of the Company Assets shall be applied and distributed, according to the fair market value thereof, in the following order:

(i)    to the creditors of the Company;

(ii)    to establishing the reserves which the Members may deem necessary for contingent or unforeseen liabilities or obligations of the Company; and

(iii)    to the Members in proportion to their Percentage Interests.

(c)    The Members shall comply with any requirements of the Act or other applicable law, except as modified by these Regulations, pertaining to the dissolution, liquidation and winding up of a limited liability company, at which time the existence of the Company shall be terminated.

Section 11.3. *Deficit Capital Accounts.*    Notwithstanding anything to the contrary contained in these Regulations, and notwithstanding any custom or rule of law to the contrary, no Member shall have any obligation to eliminate any deficit (negative) balance in his Capital Account upon dissolution or liquidation of the Company regardless of how such negative balance was caused, including without limitation by deductions and losses of the Company (including non-cash items such as depreciation) or distributions to Members pursuant to these Regulations, and upon dissolution of the Company, such deficit shall not be an asset of the Company and no Member shall be obligated to contribute any amount to the Company to bring the balance of such Member's Capital Account to zero.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

Section 12.1. *Notices.*    Any notice or communication given pursuant to these Regulations must be in writing and may be given by registered or certified mail, and if given by registered or certified mail, shall be deemed to have been given and received when a registered or certified letter containing such notice, properly addressed with postage prepaid is deposited in the United States mails; and if given otherwise than by registered or certified mail, it shall be deemed to have been given when delivered to and received by the party whom addressed. Such notices or

12

communications shall be given to the parties hereto at the addresses set forth on Exhibit A. Any party hereto may designate any other address in substitution for the foregoing address to which such notices shall be given by five (5) days' notice duly given hereunder to the other parties.

Section 12.2. *Governing Law.* These Regulations shall be governed by and construed in accordance with the laws of the State of Texas. In particular, these Regulations are intended to comply with the requirements of the Act and the Articles of Organization. In the event of a direct conflict between the provisions of these Regulations and the mandatory provisions of the Act or any provision of the Articles of Organization, the Act and the Articles of Organization, in that order of priority, will control.

Section 12.3. *Successors and Assigns.* These Regulations shall be binding upon and shall inure to the benefit of the Members and their respective permitted heirs, legal representatives, successors and assigns.

Section 12.4. *Amendment.* These Regulations and the Articles of Organization may be amended by the approval of sixty-six and two-thirds percent (66⅔%) in Percentage Interest of the Members, except that

(a)    the amendment of any provision of these Regulations that requires unanimous approval of the Members for an action or decision shall require unanimous approval of the Members;

(b)    no amendment of these Regulations shall reduce a Member's Percentage Interest, capital interest or voting interest in the Company without that Member's approval unless the corresponding interests of all Members (other than Members who are making additional capital contributions to the Company) are reduced proportionately by such amendment; and

(c)    the amendment of this Section 12.4 shall require unanimous approval of the Members.

Section 12.5. *Construction.* Whenever required by the context, as used in these Regulations, the singular number shall include the plural and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter. Unless expressly stated herein, all references to Articles and Sections refer to articles and sections of these Regulations and all references to Exhibits refer to exhibits to these Regulations.

Section 12.6. *Offset.* Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

Section 12.7. *Counterparts.* These Regulations may be executed in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute a single document.

13

ENIDAL:20730 1 11429-00009

## Exhibit A

Ownership of
Avia Energy Development, L.L.C.

| Member | Percentage Interest |
|---|---|
| James C. Musselman<br>200 Crescent Court<br>Suite 1375<br>Dallas, Texas 75201 | 60% |
| Jack M. Lafield<br>4208 Windsor Parkway<br>Dallas, Texas 75205 | 20% |
| John P. Hughett<br>7597 Benedict Drive<br>Dallas, Texas 75214 | 20% |

ENDAL;26730.3  11439-00009

**Section 12.8. *Execution in Writing*.** A facsimile, telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by a Member, shall be treated as an execution in writing for purposes of these Regulations.

IN WITNESS WHEREOF, the Members have executed these Regulations to be effective as of June 12, 1997.

MEMBERS:

_James C. Musselman_
James C. Musselman

_Jack M. Lafield_
Jack M. Lafield

_John P. Hughett_
John P. Hughett

CAUSE NO. DC-99-225

| | |
|---|---|
| ISTHMUS CUSTOMHOUSE BROKERS, INC., AND CLAY TANK TRUCKS, INC. | IN THE DISTRICT COURT |
| VS. | 381ST JUDICIAL DISTRICT |
| AVIA ENERGY DEVELOPMENT, L.L.C., CONSTRUCCIONES PROTEXA, S.A. DE C.V., AVIA DE MEXICO, S. DE R.L. DE C.V. AND JAMES C. MUSSELMAN | STARR COUNTY, TEXAS |

## JUDGMENT

On December 4, 2000, this cause came on to be heard and CLAY TANK TRUCKS, INC., the plaintiff, appeared in person and by attorney of record and announced ready for trial and AVIA ENERGY DEVELOPMENT, L.L.C., AVIA DE MEXICO, S. DE R.L. DE C.V., and JAMES C. MUSSELMAN, defendants, appeared in person and by attorney of record and announced ready for trial and no jury having been demanded, all questions of fact were submitted to the Court.

The Court, after hearing of the evidence and arguments of counsel, is of the opinion that the plaintiff is entitled to recover from the defendants, Avia Energy Development, L.L.C., Avia De Mexico, S.De R.L De C.V., and James C. Musselman,

IT IS THEREFORE ORDERED by the Court that Clay Tank Trucks, Inc., have and recover actual damages from Avia Energy Development, L.L.C., Avia De Mexico, S.De R.L. De C.V., and James C. Musselman, $263,500.00, plus prejudgment interest from August 5, 1999, until date of judgment at Ten and No/100ths percent (10%) per annum, simple interest.

IT IS FURTHER ORDERED THAT Clay Tank Trucks, Inc., recover from Avia Energy Development, L.L.C., Avia De Mexico, S.De R.L. De C.V., and James C. Musselman, attorney's fees in the sum of $8,835.00 for services rendered through the trial of this case.

EXHIBIT

C

IT IS FURTHER ORDERED THAT the total amount of the judgment here rendered will bear interest at the rate of Ten and No/100ths percent (10%) from date of judgment until paid.

All costs of court spent or incurred in this case are adjudged against the defendants, Avia Energy Development, L.L.C., Avia De Mexico, S.De R.L. De C.V., and James C. Musselman.

All writs and processes for the enforcement and collection of this judgment or the costs of court may issue as necessary.

All relief requested in this case and not expressly granted is DENIED. This judgment finally disposes of all parties and claims and is appealable.

SIGNED ON February         15        , 2002.


_____
JUDGE PRESIDING


FILED
AT _____ O'CLOCK ___ M
FEB 1 5 2002
DISTRICT CLERK
_____

2

CAUSE NO. C-2712-99-C

| | | |
|---|---|---|
| CLYDE BREEDEN, JAMES E. BAILEY, | § | IN THE DISTRICT COURT |
| GLEN WATKINS, C.M. OLDENBURG | § | |
| d/b/a CENTENNIAL MANAGEMENT | § | |
| CORPORATION, GARY WARNER and | § | |
| CLIFFORD MARSTERS, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| | § | HIDALGO COUNTY, TEXAS |
| vs. | § | |
| | § | |
| AVIA ENERGY DEVELOPMENT, | § | |
| L.L.C., | § | |
| AVIA DE MEXICO, S. DE R.L. DE C.V., | § | |
| CONSTRUCCIONES PROTEXA, | § | |
| S.A. DE C.V. and JAMES E. | § | |
| MUSSELMAN, | § | |
| | § | |
| Defendants. | § | 139TH JUDICIAL DISTRICT |

## AGREED JUDGMENT

This matter came on for trial on the merits on December 12, 2000, and all parties appeared by and through their attorneys of record and announced to the Court that they were ready for trial, and the same was concluded December 14, 2000;

AND THE COURT, having considered the pleadings, the official records on file in this cause, the evidence and arguments of counsel finds that judgment should be entered in favor of the Plaintiffs, CLYDE BREEDEN, JAMES E. BAILEY, GLEN WATKINS, C.M. OLDENBURG D/B/A CENTENNIAL MANAGEMENT CORPORATION, GARY WARNER and CLIFFORD MARSTERS against AVIA ENERGY DEVELOPMENT, L.L.C. and AVIA DE MEXICO, S. DE R.L. DE C.V., as follows:

1. CLYDE BREEDEN have and recover judgment against AVIA ENERGY DEVELOPMENT, L.L.C. and AVIA DE MEXICO, S. DE R.L. DE D.V., jointly and severally, for

AGREED JUDGMENT - Page 1
Dallas3 679237 v 1, 11429.00013

EXHIBIT

D

labor performed in the amount of Twenty Five Thousand Nine Hundred Forty Seven Dollars and

Twenty Five Cents ($25,947.25), and pre-judgment interest in the amount of Four Thousand Four

Hundred Eleven Dollars and Three Cents ($4,411.03), together with court costs, post judgment

interest at the legal rate per annum and attorney's fees as hereinafter provided;

2.    JAMES E. BAILEY have and recover judgment against AVIA ENERGY

DEVELOPMENT, L.L.C. and AVIA DE MEXICO, S. DE R.L. DE C.V., jointly and severally, for

labor performed in the amount of Thirty Four Thousand Three Hundred Thirty Three Dollars and No

Cents ($34,333.00), and pre-judgment interest in the amount of Five thousand Eight Hundred Thirty

Six Dollars and Sixty One Cents ($5,836.61), together with court costs, post judgment interest at the

legal rate per annum and attorney's fees as hereinafter provided;

3.    CLIFFORD MARSTERS have and recover judgment against AVIA ENERGY

DEVELOPMENT, L.L.C. and AVIA DE MEXICO, S. DE R.L. DE D.V., jointly and severally, for

labor performed in the amount of Fourteen Thousand Eight Hundred Twenty One Dollars and No

Cents ($14,821.00), and pre-judgment interest in the amount of Two Thousand Five Hundred

Nineteen Dollars and Fifty Seven Cents ($2,519.57), together with court costs, post judgment interest

at the legal rate per annum and attorney's fees as hereinafter provided;

4.    C.M. OLDENBURG have and recover judgment against AVIA ENERGY

DEVELOPMENT, L.L.C. and AVIA DE MEXICO, S. DE R.L. DE C.V., jointly and severally, for

labor performed in the amount of Eleven Thousand Five Hundred Fourteen Dollars and Seventy One

Cents ($11,514.71), and pre-judgment interest in the amount of One Thousand Nine Hundred Fifty

Seven Dollars and Fifty Cents ($1,957.50), together with court costs post judgment interest at the

legal rate per annum and attorney's fees as hereinafter provided;

AGREED JUDGMENT - Page 2
Dallas3 679257 v 1, 11429.00013

5.      GLEN WATKINS have and recover judgment against AVIA ENERGY DEVELOPMENT, L.L.C. and AVIA DE MEXICO, S. DE R.L. DE C.V., jointly and severally, for labor performed in the amount of Forty Five Thousand Four Hundred Sixty Dollars and Nineteen Cents ($45,460.19), and pre-judgment interest in the amount of Seven Thousand Seven Hundred Twenty Eight Dollars and Twenty Three Cents ($7,728.23), together with court costs, post judgment interest at the legal rate per annum and attorney's fees s hereinafter provided; and

6.      GARY WARNER have and recover judgment against AVIA ENERGY DEVELOPMENT, L.L.C. and AVIA DE MEXICO, S. DE R.L. DE C.V., jointly and severally, for labor performed in the amount of Thirty Eight Thousand Six Hundred Thirty Two Dollars and Forty Four Cents ($38,632.44), and pre-judgment interest in the amount of Six Thousand Five Hundred Sixty Seven Dollars and Fifty One Cents ($6,567.51), together with court costs, post judgment interest at the legal rate per annum and attorney's fees as hereinafter provided.

It is further adjudged that the Plaintiffs, CLYDE BREEDEN, JAMES E. BAILEY, GLEN WATKINS, C.M. OLDENBURG D/B/A CENTENNIAL MANAGEMENT CORPORATION, GARY WARNER and CLIFFORD MARSTERS, have and recover against AVIA ENERGY DEVELOPMENT, L.L.C. and AVIA DE MEXICO, S. DE R.L. DE C.V., jointly and severally, a total sum of attorney's fees in the amount of Fifty Six Thousand Eight Hundred Forty Five Dollars and Ninety Six Cents ($56,845.96).

The rulings and findings in this Judgment, whether explicit or implicit, shall not be binding in any current or future action, including the one severed from this action by the Plaintiffs herein, against JAMES C. MUSSELMAN or any principal, shareholder or employee of AVIA ENERGY DEVELOPMENT, L.L.C. or AVIA DE MEXICO, S. DE R.L. DE C.V., in any way, including but not limited to res judicata, collateral estoppel or law of the case.

Dallas 679251 v.1, 11483.00013

All claims for relief not expressly granted herein be and the same is hereby DENIED.

SIGNED this _____ day of _____, 2001.

_____

JUDGE PRESIDING

AGREED TO AND APPROVED:

EATON & ASSOCIATES
2208 Primrose, Building C
McAllen, Texas 78504
Telephone: 956/631-9400
Telecopy: ~~956/687~~-9867

JOHN H. EATON
State Bar No. 06382500

ATTORNEY FOR THE PLAINTIFFS

JENKENS & GILCHRIST
1445 Ross Avenue
Suite 3200
Dallas, Texas 75202
Telephone: 214/ 855-4500
Telecopy: 214/855-4300

JACOB B. MARSHALL
State Bar No. 13027740

ATTORNEY FOR THE DEFENDANTS

*AGREED JUDGMENT* - Page 4
Dallas3 679257 v 1. 11428.000/3