CAUSE NO. 03-03314-K

| | | |
|---|---|---|
| AVIA ENERGY DEVELOPMENT, LLC; | § | IN THE DISTRICT COURT OF |
| AVIA DE MEXICO S. DE R.L. DE C.V.; | § | |
| AND JAMES C. MUSSELMAN | § | |
| | § | |
| **Plaintiffs,** | § | |
| vs. | § | |
| | § | |
| THOMAS O. HICKS and JACK D. | § | |
| FURST, | § | |
| | § | K-192 JUDICIAL DISTRICT |
| **Intervenors,** | § | |
| | § | |
| vs. | § | |
| | § | |
| CARLOS FRANCISCO NAVARRO and | § | |
| MICHAEL FARMAR | § | |
| | § | |
| **Defendants & Third-Party Plaintiff** | § | |
| vs. | § | |
| | § | |
| JACK LAFIELD and JOHN HUGHETT | § | |
| | § | |
| **Third-Party Defendants** | § | DALLAS COUNTY, TEXAS |

## MICHAEL FARMAR AND CARLOS NAVARRO'S
## MOTION TO ENFORCE RULE 11 BINDING AGREEMENT

COME NOW, Michael Farmar ("Farmar") and Carlos Navarro ("Navarro," collectively "Defendants"), and file this Motion to Enforce Rule 11 Binding Agreement ("Motion to Enforce") and would show the Court the following:

### I. INTRODUCTION

1.     On April 13, 2004, Plaintiffs James C. Musselman ("Musselman"), Avia Energy Development, L.L.C. ("Avia USA"), Avia de Mexico S. De R.L. de C.V. ("Avia de Mexico"), Thomas O. Hicks ("Hicks"), Jack. D. Furst ("Furst"), and Jack Lafield ("Lafield") entered into a Rule 11 Agreement ("Binding Agreement") before Judge Jay Patterson. The Binding Agreement contained only one condition precedent—the transfer of certain monies, then held in Mexican Courts and/or banks, into an escrow account in the United States.

2.     Farmar and Navarro diligently worked to have the money in Mexico liberated,

converted, and transferred to a bank in Texas. When counsel for Farmar provided the documents required by, and in conformity with, the Binding Agreement, Musselman and Avia refused to execute these proper documents.

3.      In short, Avia and Musselman have improperly asserted that the Binding Agreement is ineffective and have refused to abide by its express terms. The conduct of Musselman and Avia has prevented the funds from being distributed to the various parties in accordance with the Binding Agreement.

## II. FACTS RELATED TO THE ENFORCEMENT OF THE BINDING AGREEMENT

1.      On April 13, 2004, at an injunction hearing before Judge Jay Patterson, in Dallas, Dallas County, Texas, the Parties read into the record a Rule 11 Agreement. A true and correct transcript of the Binding Agreement is attached as Exhibit "A" and incorporated herein.

2.      The Binding Agreement was a settlement of all the claims, causes of action, disputes, and issues between the Parties that were pending in this case.

3.      The Binding Agreement *expressly* provided that the only condition precedent to the Binding Agreement was the transfer of the disputed funds to a bank in the United States.[1] The Parties also pledged to use their good faith efforts to have the money, which was tied up in Mexico, to be transferred to the United States to be distributed in accordance with the Binding Agreement.[2]

4.      Before concluding the Binding Agreement, Judge Patterson requested that every party expressly state that they agreed with the terms of the Binding Agreement.[3] In response, each party expressly agreed on the record to the terms of the Binding Agreement.[4]

5.      Moreover, counsel for Navarro made it expressly clear on the record that once the

---

[1] *See* Ex.A—Transcript of Proceedings dated Tuesday, April 13, 2004 ("Binding Agreement") at 13:25-14:12 (emphasis added).

[2] *See* Ex. A—Binding Agreement at 10:13-25.

[3] *See* Ex. A—Binding Agreement at 36:13-38:11.

[4] *See id.* See also id. at 33:23-34:2 ("MR. MARSH: My name is Curtis Marsh, and I represent Mr. Musselman. On behalf of Mr. Musselman, it is agreed. MS. ELKJER: And with me, it is also agreed.").

funds were transferred to Texas, the Binding Agreement required only the further execution of three documents—an assignment, a ratification, and a mutual release.[5]

6.     Thus, the Binding Agreement required the Parties to cooperate in the effort to transfer funds, which were then held in banks and/or by Courts in Mexico, to a restricted checking account in Texas. The transfer of these funds was the *only* condition precedent to the enforcibility of the Binding Agreement.[6]

7.     Farmar and Navarro, in reliance on the Binding Agreement, contacted and utilized the services of Mexican attorneys to make sure that the funds were transferred to Texas as provided by the Binding Agreement.

8.     Farmar also agreed to utilize the services of Southwest Bank of Texas (now Amergy Bank) to ensure that the money was properly transferred to the United States, that the exchange rate was as favorable as possible, and that the normal fees to transfer monies into the United States were waived.

9.     Pursuant to the efforts of Navarro and Farmar, the money was transferred to an account at Southwest Bank of Texas in Houston (now Amergy Bank). The transfer of these funds fulfilled the only condition precedent to the enforcibility of the Binding Agreement.

10.     Accordingly, the only remaining steps to be taken were: 1) execution of a Mutual Release; 2) execution of the Assignment and Ratification documents; and 3) proper distribution of the funds in accordance with the Binding Agreement.[7]

11.     By letter dated September 17, 2004, W. Pruitt Ashworth, attorney for Farmar, provided the documents necessary to conclude the settlement: 1) Ratification; 2) Assignment; and

---

[5] *See* Ex. A—Binding Agreement at 9:11-10:8 (addressing the assignment and ratification); 14:12-14 (discussing the transfer of funds as the only condition precedent); and 28:18-23 (reflecting admission by Ms. Elkjer that Binding Agreement was not subject to documentation).

[6] *See* Ex. A—Binding Agreement at 13:25-14:12 (emphasis added).

[7] *See* Ex. A—Binding Agreement at 9:11-10:8 (addressing the assignment and ratification); 14:12-14 (discussing the transfer of funds as the only condition precedent); and 28:18-23 (reflecting admission by Ms. Elkjer that Binding Agreement was not subject to documentation).

3) Mutual Release.[8]  See Ashworth letter of September 17, 2004 with attachments (attached as Exhibit B).  Once these documents were signed and properly executed, the money could be distributed in accordance with the Binding Agreement.  Unfortunately, Musselman and Avia de Mexico, have refused to sign the necessary documents.

12.     The Binding Agreement expressly provides that the execution of subsequent documentation was *not* a condition precedent:

> once the money gets up to the U.S. to the extent we can get it up to the U.S. . . . then we will divide it up in accordance with what I just told the Court.  Now, if in fact we do not—or are not successful in doing what we want to do, then there is no agreement.  These are the conditions precedent.  Now the flip side of it is, if in fact we accomplish this and the money comes to the U.S., *then* this is a binding settlement agreement that we are reading into the record, *and* all of the things will be done.[9]

To further emphasize that the Binding Agreement was a complete agreement that had only one condition precedent—the transfer of the funds to the United States, the counsel for Navarro expressly stated that "[i]t will not—the intent is not to get the money up here and then say, 'king's ex, we are going to fight over the money.'  We are not agreeing to that."[10]

13.     To ensure that there was no dispute about the role of subsequent documentation, counsel for Navarro pointedly asked Ms. Elkjer if it was her position that "our settlement agreement on the record [was] subject to documentation?"[11]  Ms. Elkjer expressly responded "[n]o, no, no."[12]  No other party interjected and corrected Ms. Elkjer or Mr. Elrod regarding the role of subsequent documentation.

### III.  CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Farmar and Navarro pray that the Court grant

---

[8] *See* Ex. B—Ashworth letter; *See also* Ex. A—Binding Agreement 9:11-10:9; 14:12-14; and 28:18-23.

[9] *See* Ex.A—Binding Agreement at 13:25-14:12 (emphasis added).

[10] *See* Ex. A—Binding Agreement at 14:12-14.

[11] *See* Ex. A—Binding Agreement at 28:18-22.

[12] *See id.* at 28:23.

in all respects their Motion to Enforce, and that it award to Farmar and Navarro their attorney's fees proved up and incurred. Farmar and Navarro further pray for all such other relief, whether general or special, both at law and in equity, to which they are entitled.

Respectfully submitted,

By: _____
W. Pruitt Ashworth
State Bar No. 01387100

**Law Office of W. Pruitt Ashworth**
500 N. Akard Street
Suite 3000
Dallas, Texas 75201
(214) 855-5188
(214) 855-5183 (Fax)

**ATTORNEY FOR DEFENDANT AND THIRD-PARTY PLAINTIFF MICHAEL FARMAR**

and

By: _____
David W. Elrod
State Bar No. 06591900
Brian A. Farlow
State Bar No. 00795339

**ELROD, PLLC**
500 N. Akard Street
Suite 3000
Dallas, Texas 75201
(214) 855-5188
(214) 855-5183 (Fax)

**ATTORNEYS FOR DEFENDANT AND THIRD-PARTY PLAINTIFF CARLOS NAVARRO**

CERTIFICATE OF SERVICE

I hereby certify that on the 15 day of June, the forgoing pleading has been served upon all counsel of record in accordance with the Texas Rules of Civil Procedure via certified mail, return receipt requested.

W. Pruitt Ashworth

## CERTIFICATE OF CONFERENCE

This is to certify that I have discussed the Rule 11 Agreement with all the attorneys in this case and there is no agreement regarding its enforcibility.

Signed the 15 day of June, 2005.

W. Pruitt Ashworth

REPORTER'S RECORD

COPY

TRIAL COURT CAUSE NO. 03-3314-K

AVIA ENERGY DEVELOPMENT, LLC, ) IN   THE   DISTRICT COURT
AVIA DE MEXICO S. DE R.L. DE   )
C.V., and JAMES C. MUSSELMAN,  )
      Plaintiffs,                )
                              )
VS.                            )
                              )
THOMAS O. HICKS and JACK D.    )
FURST,                         )
      Intervenors,               )
                              )
VS.                            ) OF DALLAS COUNTY, TEXAS
                              )
CARLOS FRANCISCO NAVARRO       )
and MICHAEL FARMAR,            )
     Defendants and            )
     Third-Party Plaintiffs,   )
                              )
VS.                            )
                              )
JACK LAFIELD and JOHN HUGHETT, )
     Third-Party Defendants.   ) 192ND JUDICIAL DISTRICT

RULE 11 AGREEMENT

TUESDAY, APRIL 13, 2004

EXHIBIT
A

On the 13th day of April 2004, the following

proceedings came on to be heard in the above-entitled

and numbered cause before the Honorable Jay Patterson,

Judge Presiding, held in Dallas, Dallas County, Texas.

      Proceedings reported by machine shorthand.

1

2    APPEARANCES:

3

4    MS. KIMBERLY A. ELKJER          ATTORNEY FOR PLAINTIFFS
     State Bar No. 06527040          Avia Energy Development
5    Scheef & Stone, L.L.P.          and Avia de Mexico
     5956 Sherry Lane, Suite 1400
6    Dallas, Texas  75225
     Telephone:  (214) 706-4200
7    Facsimile:  (214) 706-4242

8

9    MR. CURTIS L. MARSH             ATTORNEY FOR PLAINTIFF
     State Bar No. 13020050          James C. Musselman
10   Curtis L. Marsh, Attorney & Counselor
     370 Founders Square
11   900 Jackson Street
     Dallas, Texas  75202
12   Telephone:  (214) 573-6311
     Facsimile:  (214) 752-1140

13

14

15
     MR. DAVID W. ELROD             ATTORNEYS FOR DEFENDANT
16   State Bar No. 06591900         Francisco Navarro
     MR. BRIAN A. FARLOW
17   State Bar No. 00795339
     Elrod, P.L.L.C.
18   500 North Akard Street, Suite 500
     Dallas, Texas  75201
19   Telephone:  (214) 953-0182
     Facsimile:  (214) 953-0185
20

21
     MR. W. PRUITT ASHWORTH         ATTORNEY FOR DEFENDANT
22   State Bar No. 01387100         Michael Farmar
     Law Office of W. Pruitt Ashworth
23   500 North Akard Street, Suite 3000
     Dallas, Texas  75201
24   Telephone:  (214) 953-0182
     Facsimile:  (214) 953-0185
25

```
 1

 2     APPEARANCES continued:

 3

 4

 5     MR. LEWIS T. LeCLAIR          ATTORNEY FOR INTERVENORS
       State Bar No. 12072500       Thomas O. Hicks and
 6     MS. JENNIFER YELTON HENRY     Jack D. Furst
       State Bar No. 24013790
 7     McKool Smith, P.C.
       300 Crescent Court, Suite 1500
 8     Dallas, Texas  75201
       Telephone:  (214) 978-4000
 9     Facsimile:  (214) 978-4044

10

11

12     MR. WILLIAM STEPHEN BOYD      ATTORNEYS FOR THIRD-PARTY
       State Bar No. 02780500        DEFENDANT, Jack Lafield
13     MR. THOMAS F. LILLARD
       State Bar No. 12352900
14     MR. ANDREW SZYGENDA
       State Bar No. 24033251
15     Hunton & Williams, L.L.P.
       Energy Plaza, 30th Floor
16     1601 Bryan Street
       Dallas, Texas  75201-3402
17     Telephone:  (214) 979-3000
       Facsimile:  (214) 880-0011
18

19

20

21     MR. COLLIN PORTERFIELD        ATTORNEY FOR THIRD-PARTY
       State Bar No. 16159900        DEFENDANT, John Hughett
22     The Porterfield Law Firm
       14850 Montfort Drive
23     Suite 220, LB 12
       Dallas, Texas  75254
24     Telephone:  (972) 960-2600
       Facsimile:  (972) 239-6696
25
```

1

2

3  APPEARANCES continued:

4

5

6  MR. ROBERT E. COUHIG, JR.
   State Bar No.
7  MR. JONATHAN P. LEMANN
   State Bar No.
8  Couhig Partners, L.L.P.
   1100 Poydras Street, Suite 1150
9  New Orleans, Louisiana  70163
   Telephone:  (504) 588-1288
10  Facsimile:  (504) 588-9750

11

12

13

14  Also Present:    Roberto Aparicio Moreno
                    Miguel Angel Abramo Martinez
15                  And many others not identified

16

17

18

19

20              *         *         *

21

22

23

24

25

```
1                   P R O C E E D I N G S

2

3               THE COURT:  Are we ready to get on the

4     record?

5               MR. ELROD:  Yes, Your Honor, we are.

6               THE COURT:  Okay.  Have you reached an

7     agreement?

8               MR. ELROD:  Yes, Your Honor, we believe

9     we have.  This is David Elrod --

10              THE COURT:  We have some doughnuts and

11    coffee we could bring out, if that would help you all

12    in reaching an agreement is this matter.

13              MR ELROD:  We may need to bring out the

14    doughnuts.

15              Your Honor, my name is David Elrod.  I'm

16    here on behalf of Carlos Francisco Navarro, and I

17    believe we have reached an agreement in this case that

18    we want to read on the record.

19              It is a very complicated little

20    agreement, but let me give it my best shot and see if

21    Mr. LeClair wants to -- who represents Mr. Hicks and

22    Mr. Furst, or Ms. Elkjer or Mr. Marsh who represent

23    Avia Energy Development, L.L.C., or Avia de Mexico and

24    Mr. Musselman have any additions to it they want to

25    make.
```

```
 1              THE COURT:  Do you have the cause number?
 2              MR. ELROD:  Mr. Ashworth is here on
 3   behalf of Mr. Farmar, who has been joined in the
 4   lawsuit.
 5              THE COURT:  Let me interrupt you a
 6   second.  This is Cause Number 03-3314-K, out of the
 7   192nd District Court, Avia Energy Development, et al.,
 8   versus -- let's see, Navarro, et al.
 9              MR. ELROD:  Yes, Your Honor.
10              THE COURT:  All right.  Please go ahead.
11              MR. ELROD:  As a part of the agreement,
12   there is money that is down in Mexico.  Part of it is
13   in a Mexican bank called Bancomer, which was a party
14   to this case to begin with, and the rest of it is in
15   various courts in Mexico based upon actions that are
16   pending in Mexico.
17              What we have agreed here amongst the
18   parties in this lawsuit here in Dallas is that we will
19   all agree that a mutual injunction should be entered
20   in this case involving all parties that are here today,
21   and that none of the moneys that are in Mexico will be
22   affected by any actions taken by any of the parties
23   here.
24              In other words, we want to maintain the
25   status quo of the moneys that are in Mexico.  If they
```

1  are in Bancomer Bank, they stay in Bancomer Bank.  If

2  they are in the registry of the Mexican court, they

3  stay in the registry of the Mexican court, and that

4  none of us will take or cause any action to be made to

5  affect that money without -- without the consent of

6  Mr. Farmar, Dr. Navarro, and Mr. Musselman.  It takes

7  all three of them to consent before something can

8  happen to this money.

9           Now, as to the -- as to the -- and the

10  purpose of that is, we are going to try to resolve

11  the lawsuits that are pending in Mexico in order to

12  transfer the moneys up to an escrow account so that we

13  can disburse the moneys pursuant to what I'm getting

14  ready to tell the Court is the formula.

15           Now, there will be -- there are $320,000

16  of a judgment to Mr. Gomez in Mexico.  That's not part

17  of this.  That money stays separate in the sense that

18  we are not going to bring that money to the U.S.

19           Out of the total moneys, there will be

20  $320,000 paid to Gomez, or however that's resolved by

21  Dr. Navarro.

22           There will be $300,000 paid to Clay Tank,

23  which is a creditor.

24           There will be $375,000 that goes to Dr.

25  Navarro to take care of Mexican obligations such as

1    taxes and these types of things, or to him personally

2    if all of that is resolved.

3           There is $635,000 that goes to Mr.

4    Farmar.

5           There is $745,000 that goes to Mr. Hicks

6    and Mr. Furst.

7           There is $175,000 that goes to Mr.

8    Musselman.  And that's for a total of $2,550,000.

9           Now, one of the issues we have here is

10    that 17 million of that is in pesos.  And so depending

11    upon the conversion rate, it may be greater than or

12    less than that, and so that is the rough number that

13    we have for the Court.

14           Also in this matter, all attorneys -- all

15    attorneys will be paid by the respective clients.  And

16    what I mean by that is, if we resolve those actions in

17    Mexico, that doesn't mean that the Mexican attorneys

18    who are working on it will grab part of those moneys.

19           That means that in fact the total amount

20    -- it is $375,000 plus $320,000, the Gomez money and

21    the $375,000 going to Dr. Navarro in Mexico, that

22    jointly will be used to resolve those attorney's fees

23    in Mexico that are an obligation in Mexico as well as

24    the creditors and the tax, other than the attorney

25    that's currently working for Mr. Musselman.  And that

1   attorney is --

2          MR. ABRAMO-MARTINEZ:  Miguel Abramo.

3          MR. ELROD:  And he will be paid directly

4   by Mr. Musselman, not out of any of the $375,000 or

5   the $320,000 that's going to stay in Mexico.

6          All the attorneys up here will be paid

7   by the respective clients.  It is not -- so if they

8   want to take their share of the money and pay their

9   attorneys, that's up to them how they handle that

10  payment.

11         Now we have an issue of who owns Avia

12  de Mexico, and that is a Mexican corporation that was

13  incorporated in Mexico.  And there has been a dispute

14  in the case about who owns that corporation, Your

15  Honor.  And part of the settlement we resolve as

16  follows:

17         There was a transfer of 99 percent in

18  Avia de Mexico by Avia U.S.A., and that transfer was to

19  Dr. Navarro, and the documents are before this Court.

20  Certified copies of that transaction have been filed in

21  this matter.

22         That transaction will be ratified by

23  Avia U.S.A., and the proper steps will be taken by

24  Mr. Musselman and Avia U.S.A. to make sure that that

25  transaction is ratified and acknowledged and that Dr.

1  Navarro owns 99 percent of Avia de Mexico.

2          There is a 1 percent of Avia de Mexico

3  owned by Mr. Musselman individually, and that part of

4  the agreement will cause Mr. Musselman to transfer that

5  1 percent of the ownership in Avia de Mexico to the

6  designee of Dr. Navarro, so there will be 100 percent

7  ownership of Avia de Mexico by Dr. Navarro as part of

8  this settlement.

9          The Court entered an interlocutory order

10  setting aside that part of the order, and the agreement

11  calls that that interlocutory order will be withdrawn

12  in accordance with the parties' agreement.

13          The parties also jointly agree to take

14  all actions necessary and to execute all documents

15  which are required in order for Avia de Mexico to

16  perform and fulfill its corporate obligations and to

17  reduce and resolve any tax issues in Mexico. And

18  that's a joint obligation on all of the parties in the

19  room, so we all have to jointly take whatever steps are

20  necessary to resolve these issues in Mexico in order to

21  maximize the reduction of any potential tax obligations

22  that would happen to Avia de Mexico in Mexico, and to

23  make sure that Avia de Mexico in fact fulfills its

24  corporate obligations under Mexican law. And that's

25  everybody's obligation to this agreement.

1                    There will be mutual releases signed

2    by all parties in this action. Also, part of the

3    resolution of the claims pending in Mexico --

4                    THE COURT: Are they mutual general

5    releases?

6                    MR. ELROD: Yes, Your Honor, they will be

7    mutual general releases of everything. We don't want

8    any more litigation between these parties, Your Honor.

9                    Also what we are going to do--and it is

10   a joint obligation on the parties' behalf--is that we

11   are jointly setting up a procedure that we can resolve

12   those issues in Mexico, and that's that we will get

13   releases from the claimants in Mexico as part of the

14   resolution of their particular claims. We think we

15   have come up with a mechanism to do that. Also, it

16   will call for a dismissal of the lawsuit with prejudice

17   by all parties and its counterclaims, interventions and

18   everything else.

19                   To facilitate the matter, we also have --

20   there are certain actions that we have mentioned

21   pending in Mexico. One of them is Mr. Farmar has a

22   judgment that's on appeal. And in order to accomplish

23   this, we are going to withdraw the objection to that

24   judgment where that judgment can go to conclusion.

25                    So there is one exception to the mutual

1   injunction, and that is, we are going to take actions

2   that are necessary to resolve those issues in Mexico.

3   So I guess we need to clarify this.  If we are all

4   enjoined from doing anything, then we can't do anything

5   to get done what we need to get done.

6            Part of what's going to happen is they

7   are going to -- Avia de Mexico will withdraw its

8   objection to Mr. Farmar's lawsuit in order that we

9   could get those moneys.  Mr. Farmar has agreed then

10  once that judgment is final, those moneys will come

11  up to an escrow account in Dallas, and that no one can

12  touch those moneys without the consent of Mr. Farmar,

13  Dr. Navarro, and Mr. Musselman.  So the goal is to get

14  that judgment of Mr. Farmar in Mexico final so we can

15  get those moneys out of Mexico up to an escrow account

16  in the U.S. so we can divide them up in accordance with

17  the agreement.

18            Also what we have further agreed to do

19  is to give a very limited power of attorney under Avia

20  de Mexico to counsel for Mr. Musselman in Mexico, and

21  that's limited to this extent.  Before anyone can take

22  any actions on judgments down in Mexico or transfer any

23  moneys, it is going to take our consent.  So we -- they

24  need to designate --

25            MS. ELKJER:  Our consent.

1          MR. ELROD:  That's what I'm saying.

2    All of our consent.  So they need to designate a

3    representative from Mexico.  We have a designated

4    representative from Mexico--Dr. Navarro.  And so before

5    one party can take any action as to a judgment, it has

6    to have both of us signing off on it.  In other words,

7    it has to be a mutual decision, Your Honor.

8          THE COURT:  When you say "all," do you

9    mean the same three individuals which you mentioned

10   previously?

11         MR. ELROD:  The same three individuals

12   that I have mentioned, Your Honor, and I'm limiting

13   that to the three individuals.  And that has to be

14   Mr. Farmar, it has to be Dr. Navarro, and it has to be

15   Mr. Musselman sign.  And of course that incorporates

16   the two corporations because amongst the three of us --

17   among Dr. Navarro and Mr. Musselman, we control those

18   two companies.

19         And so once Mr. Musselman's side agrees

20   and Dr. Navarro's side agrees, that's an agreement by

21   Avia de Mexico and Avia of the U.S.A.  So we don't

22   need -- we will not need the agreement of Mr. Lafield

23   or Mr. Hughett for that.  Just Mr. Farmar, Dr. Navarro,

24   and Mr. Musselman, whoever their designee is.

25         And once the money gets up to the U.S.,

 1    to the extent we can get it up to the U.S. -- and

 2    that's our goal, is jointly is to do that -- then we

 3    will divide it it up in accordance with what I just

 4    told the Court.

 5            Now, if in fact we do not -- or are not

 6    successful in doing what we want to do, then there is

 7    no agreement.  These are conditions precedent.

 8            Now, the flip side of it is, if in fact

 9    we accomplish this and the money comes to the U.S.,

10    then this is a binding settlement agreement that we are

11    reading into the record, and all of these things will

12    be done.  It will not -- the intent is not to get the

13    money up here and then say, king's ex, we are going to

14    fight over the money.  We are not agreeing to that.

15    If the money comes to the U.S. as we have talked about,

16    then everybody has to abide by the rest of the terms of

17    what we just read into the record.

18            Now, the mutual injunction is going to

19    last for 90 days.  And during that time period, we are

20    going to be documenting this agreement, and we are

21    going to be taking jointly all of those efforts that

22    are necessary to resolve the Mexico situations so we

23    can get the money up here and disbursed in accordance

24    with the agreement.

25            Does anybody have anything to add?

1           MR. LeCLAIR:  I'm Lewis LeClair.  I

2     represent Thomas Hicks and Jack Furst.

3           And I do want to clarify for the record,

4     although I agree with Mr. Elrod that the events that

5     he outlined are the ultimate effect of the settlement,

6     I do want to be sure that we understand how things are

7     to operate in the interim.

8           Because the problem that we have here is,

9     I think that Mr. Elrod's side of the table has some

10    perceived advantage in Mexico, and this side of the

11    table has some perceived--whether real or not--

12    advantage if the money is up here.  And so both sides

13    are trying to protect to make sure that they are fully

14    protected from -- by virtue of this settlement, from

15    something happening untoward in one place or another.

16    Mr. Elrod has very carefully protected that if the

17    money is up here, we have a deal, and so the money

18    flows the way he has said.

19          At the same time, what our side of the

20    table is trying to make sure is that while we are in

21    agreement to transfer the ownership as indicated to

22    Dr. Navarro and Avia de Mexico, that that is in

23    comtemplation that all of this happens in accordance

24    with the settlement agreement.  And what we are not

25    prepared to do is grant total control of Avia de Mexico

```
 1   to Dr. Navarro until -- unless and until this all comes

 2   together the way it is supposed to come together.

 3               And so for that reason --

 4               THE COURT:  Do you all contemplate a

 5   final closing, do you?

 6               MR. ELROD:  Yes, Your Honor, we do.

 7               MR. LeCLAIR:  Yes.

 8               THE COURT:  So that once you are ready

 9   with the funds in escrow and documentation to transfer

10   ownership, there would be a simultaneous closing.  Is

11   that right?

12               MR. ELROD:  Yes, Your Honor.  And Mr.

13   LeClair is right, and I didn't mean to say that the

14   transfer is going to occur before all this happens.

15   That's why we have an obligation on all of us to

16   jointly take all actions necessary to make sure it

17   happens.

18               THE COURT:  Is it the intent of all

19   parties that this Rule 11 agreement is an enforceable

20   settlement agreement?

21               MR. ELROD:  Yes, Your Honor.

22               MR. LeCLAIR:  It is an intention that it

23   be an enforceable settlement agreement.

24               THE COURT:  I interrupted you, Mr.

25   LeClair.  Sorry.  Please go ahead.
```

1          MR. LeCLAIR:  I also wanted to clarify

2   for the record, with respect to the money in Mexico, I

3   think it is important that we put on the record exactly

4   as best we understand it today the status of the money.

5          There are 17 million pesos that are tied

6   up in connection with a judgment of Michael Farmar in

7   Mexico that is on appeal, and so the parties are still

8   -- neither side has gotten control of that money.  It

9   is on appeal in Mexico, and it is frozen for the time

10  being.

11         And our understanding is that pursuant

12  to this settlement agreement, when we are confident

13  that this is all going to work, we will withdraw our

14  objection to the Farmar judgment to allow that money

15  to be -- to be given to Farmar to flow up to escrow in

16  the United States.  So that's the -- that's the

17  contemplation.

18         There is also -- there are also three

19  other claimants who have tied up money in Mexico.

20  There is Inocencio de Perez, who has --

21         DR. NAVARRO:  Inocencio de Leon Perez.

22         MR. LeCLAIR:  -- de Leon Perez who has

23  $579,000 tied up in a Mexican court.  There is an

24  Otto Hugo Sampogna who has approximately $30,000,

25  as I recall, that's tied up in a Mexican court.

```
 1                    MR. ELROD: Oh, no, more than that.
 2                    DR. NAVARRO: There is not -- he never
 3    got any money assigned to him. There was no --
 4                    MR. LeCLAIR: Okay. There is $108,000
 5    tied up --
 6                    MR. ELROD: It is $108,500, and that's in
 7    a Vancouver bank. $100,500.
 8                    The amount that Mr. de Leon has is
 9    $575,500. And then there is the $320,000 that Mr.
10    Gomez has a judgment on that's in the court.
11                    MR. LeCLAIR: Well, is it everybody's
12    understanding that there is $2,550,000 U.S. in total
13    that is down in Mexico that's the subject of this
14    agreement?
15                    DR. NAVARRO: It depends upon the
16    exchange rate.
17                    MR. ELROD: Yeah, it just depends upon
18    the exchange rate, the conversion rate.
19                    MR. LeCLAIR: If you assume a conversion
20    rate of 11 pesos per U.S. dollar, doesn't it total
21    $2,550,000?
22                    MR. ELROD: Right.
23                    MR. LeCLAIR: And that's as of today, the
24    exchange rate is approximately 11 pesos to U.S. dollar.
25                    MR. ELROD: Right. But the agreement we
```

```
 1   have to have is, we have to make sure we maximize the
 2   value of that 17 million pesos.
 3               MR. LeCLAIR:  All right.
 4               MR. ELROD:  Your Honor, we don't want
 5   somebody to demand we have to convert right away or
 6   whatever, if we think it is going to get greater value
 7   by waiting.
 8               THE COURT:  But it would be the value at
 9   the time of the simultaneous closing or what?
10               MR. ELROD:  No.  We are going to try to
11   convert it as soon as possible.
12               MR. LeCLAIR:  And --
13               MR. ELROD:  As soon as we can, we are
14   going to try to maximize the value of that 17 million
15   pesos.
16               THE COURT:  And the standard for some
17   of these things that it is impossible to make specific
18   now, is it a reasonable standard under Texas law?
19               MR. ELROD:  Yes, Your Honor.
20               THE COURT:  All right.  Please go ahead.
21               MR. LeCLAIR:  With respect to the
22   claimants in Mexico, the way in which the parties
23   contemplate this will occur is that Dr. Navarro will
24   negotiate with the Mexican claimants.  And part of the
25   $375,000 that is allocated to Dr. Navarro is to -- is
```

1   for him to dispose of the Mexican claimants, which will

2   then free up the money to allow it to be distributed in

3   accordance with the agreement.

4           And, obviously, then if Dr. Navarro is

5   successful in reducing the claims in Mexico below

6   $375,000, then he benefits to that extent. And the

7   agreement is, if he cannot get it done for $375,000,

8   then we have a failure of a condition of the settlement

9   agreement.

10          And so all of that has to occur during

11  this 90-day period, is for that negotiation to occur

12  to allow that money -- and in the meantime, and what I

13  want to be clear on the record is, in the meantime --

14  because what we do not want to have happen is money

15  flow out of the Mexican courts to any claimant unless

16  and until we are sure that we have received the money

17  that we are entitled to under this settlement

18  agreement.

19          MR. ELROD: Are you excluding the Gomez

20  money?

21          MS. ELKJER: No, even the Gomez.

22          MR. LeCLAIR: We are going to -- he is

23  excluded from coming back here, but his money is still

24  going to be tied up. We are not going to allow the

25  money of Gomez to flow out to Gomez unless and until

1    we are sure the settlement is going forward.

2              The idea is that the Gomez money will

3    stay in place until we have met the condition of the

4    settlement agreement that allows the money to flow to

5    the United States.  That's the understanding of the

6    parties.

7              MS. ELKJER:  And so we will continue to

8    take those actions until we get an agreement from

9    Gomez.

10             MR. ELROD:  I thought Gomez had a final

11   judgment.

12             MR. LeCLAIR:  Yes, but there is also

13   the possibility of filing an appeal in federal court

14   similar to what we have already done.

15             MR. ELROD:  Okay.

16             MR. LeCLAIR:  And so the idea is that we

17   will -- we would -- we would love it if we didn't have

18   to do that.  But what I'm saying is, we are not going

19   to allow the Gomez money to flow out unless and until

20   we know our deal is going to make.  And that's why we

21   are saying we want to have the ability to continue to

22   do that.

23             MR. ELROD:  Well, I just thought it was

24   a final judgment.

25             MR. LeCLAIR:  And I think it is the

1    agreement of the parties, since it is Avia de Mexico

2    that actually has to act with respect to the Gomez

3    money, that the parties here are jointly agreeing we

4    will jointly act to protect the money from Gomez until

5    such time as we have met the conditions of the

6    settlement agreement.  Is that our agreement?

7              MR. ELROD:  Well, I want to make one

8    thing clear about that.  That Gomez money, that

9    $320,000, to the extent that we can negotiate a

10   reduction of that amount, goes to the Mexican side.

11   It doesn't come back up here to anybody else.

12             MR. LeCLAIR:  That is the agreement.

13   But what I'm saying is, we are not going to allow it

14   to be distributed until we know that the settlement

15   conditions have occurred and we have a deal that pays

16   people in accordance with the agreement.

17             MR. ELROD:  I don't disagree with that.

18             MR. LeCLAIR:  Okay.  That's what I'm

19   trying to say.  So until that time, we are jointly

20   agreeing that we will operate -- we will do what's

21   necessary, sign the papers as necessary to tie up the

22   Gomez judgment unless and until we reach the point in

23   time at which we know that settlement conditions have

24   occurred.

25             MR. ELROD:  Right.

1    THE COURT:  Now, does that -- what has

2  been stated on the record, does that correctly reflect

3  the agreement being entered into by all the parties

4  represented here this morning?

5    MS. ELKJER:  (Indicating)

6    THE COURT:  It does not?

7    MS. ELKJER:  I have a few clarifications

8  also.

9    THE COURT:  All right.

10    MS. ELKJER:  My name is Kim Elkjer, and

11  I represent Avia U.S.A. and Avia de Mexico.  And in

12  going through the list that Mr. Elrod went through, I

13  just want to clarify a few things.

14    One of the terms was that all parties

15  agree to execute all documents for Avia de Mexico to

16  fulfill its corporate obligations and tax

17  responsibilities, or something of that nature.

18    And I want to make it very clear that

19  Jim Musselman and the parties that I represent are not

20  taking responsibility for the tax liability.  We will

21  cooperate to reduce the tax liability, but we are not

22  taking any personal responsibility for the tax

23  liability.

24    MR. ELROD:  Kim, my point was that

25  obviously you all have to take all steps that are

1    necessary and execute those documents that we deem are

2    necessary to reduce and to resolve any tax liability of

3    Avia de Mexico in Mexico.

4              MS. ELKJER:  And I just wanted to make it

5    was very clear.  We will cooperate in that, but we are

6    not assuming any liability for those taxes.  So -- I

7    mean, I just wanted --

8              MR. APARICIO MORENO:  Maybe in Mexico,

9    that's what you're referring to.  It may come with Jim

10   Musselman as an ex-partner because he is liable for

11   what's happened in the past, why did they have to pay

12   any taxes.

13             MR. ELROD:  State your name for the

14   record.

15             MR. APARICIO MORENO:  I'm Roberto

16   Aparicio from Mexico City.

17             MR. ELROD:  And he's a lawyer in Mexico,

18   Your Honor.

19             THE COURT:  And what -- do I understand

20   correctly that the agreement is that by entering into

21   this agreement, Ms. Elkjer's client is not assuming any

22   new liability that he may not have already had under

23   Mexican law?

24             MR. ELROD:  That is correct, Your Honor.

25             THE COURT:  All right.

1          MR. ELROD:  What he has, he has.  He is

2    not assuming anything new.

3          THE COURT:  All right.  Ms. Elkjer,

4    please go ahead.

5          MS. ELKJER:  All right.  The next thing

6    that I wanted to bring up, which I think Lewis may have

7    clarified, but with regard to the actions pending in

8    Mexico and the money that is going to stay in Mexico,

9    nothing here today is going to prohibit actions being

10   taken to keep those moneys in the Mexican courts until

11   such time as the settlement is final.

12         So there will continue to be -- until we

13   either get an agreement with the Mexican claimants or

14   have the full settlement final, actions will continue

15   to be taken in Mexico to protect those moneys until

16   that time.

17         MR. ELROD:  It is just we are doing it

18   jointly now.

19         MR. MARSH:  Yes.

20         MS. ELKJER:  Well, then if we are -- if

21   we are doing it -- if we are doing it jointly, then

22   we need Dr. Navarro to not unreasonably withhold

23   consent to filing things.  Like, for instance, in the

24   Gomez lawsuit, dual powers needs to be filed within the

25   next two weeks or that money is going to flow to Gomez.

1   So we need an agreement that Dr. Navarro, when we get

2   the dual powers in place, will execute the necessary

3   documents to keep that in place.

4            MR. ELROD: Right. Right. Ms. Elkjer,

5   we don't have any problem with that. The same thing

6   is true on your side. But what we've got to do is have

7   all the attorneys agree on what needs to be done and

8   not get a 25-page agreement with all kinds of stuff in

9   it that's inappropriate, and so I think we can act in

10  that regard.

11           I really -- I really don't want to go

12  down this path. I think the parties -- I think the

13  parties can make an agreement that they need to do

14  what's necessary to protect the moneys so it doesn't

15  go to the claim until we get this resolved.

16           MS. ELKJER: Right. You also mentioned

17  that a limited power of attorney was going to be given

18  to counsel for Mr. Musselman so that certain actions

19  can be taken.

20           And I want to clarify that in Mexico, and

21  so we all understand this, to get -- to give a power

22  of attorney in Mexico, there has to be a shareholders

23  meeting in which the power of attorney is given. So

24  that means that there will have to be a shareholders

25  meeting of Avia de Mexico to give Miguel Abramo this

1     limited power of attorney with regard to handling the

2     lawsuit and handling the bank.

3                    And I understand that this is going to

4     be a joint power of attorney given to Dr. Navarro and

5     Miguel Abramo so that Avia de Mexico cannot act in this

6     regard without both of their signatures.  However, they

7     both are making a commitment to take whatever actions

8     necessary to protect Avia and to keep the money in

9     place until we've got agreements with everyone.

10                   MR. ELROD:  Right.  What we are going to

11    do in that regard is, to the -- I mean, we've got two

12    Mexican counsel here, and we will do what they tell us

13    is necessary and appropriate under Mexican law to give

14    Mr. Musselman's representative a very limited power of

15    attorney to handle those two things we have discussed.

16                   MS. ELKJER:  All right.  And then the

17    last thing is, we have agreed to a mutual injunction.

18    I did not remember that it was limited to 90 days, but

19    we can take that up later and extend it, if we need to.

20                   However, I do not believe injunctions are

21    valid until they are in writing.  And so what I thought

22    we agreed to do was to have the temporary restraining

23    order in place until such time as the injunction went

24    into effect so that we always have people enjoined one

25    way or the other from affecting the Mexican accounts.

1          MR. ELROD:  I believe that -- and Judge

2     Patterson can correct me if I'm wrong.  But when we

3     all say, yes, this is our agreement on the record, this

4     is binding and enforceable, including the injunction,

5     among the parties in this room when we say yes.

6          I'm not prepared to agree to that at all

7     because I don't think that's what we are agreeing to.

8     I think once we say, yes, we have a deal before this

9     Court, then we have a deal, and this Court will hold

10    us to that deal.

11          MS. ELKJER:  I guess I have a bit of a

12    concern because the deal was stated on the record, and

13    there can always be the argument that it was vague and

14    we didn't quite understand it to mean this.  And so

15    until we get it in writing what this mutual injunction

16    is, I think that the temporary restraining order should

17    stay in place.

18          MR. ELROD:  Are you telling me we do not

19    have a deal?  You're not going to tell the Court today

20    that this is our settlement agreement on the record

21    subject to documentation?  Because if that's what you

22    are saying, then we don't have a deal.

23          MS. ELKJER:  No, no, no.  I'm just saying

24    that I think the injunction needs to be put in writing;

25    and until such time as it is put into writing, the

1  restraining order is extended.

2              MR. ELROD:  Yeah, we cannot agree to that

3  TRO.

4              THE COURT:  Why can't you do the

5  temporary injunction today and get it back here for my

6  signature?

7              MR. ELROD:  We can.  It is just a simple

8  one-page mutual injunction.

9              THE COURT:  In fact, we would let you --

10  we would let you use our computer equipment if you

11  wanted to do it right here.

12              MR. ELROD:  Yeah, it is just a one-

13  paragraph deal, Your Honor.  In fact, we've got a Rule

14  11 in place that basically says that.  So I'm not real

15  concerned about the language.  We just cannot execute a

16  four-page extended TRO that has all kinds of stuff in

17  it that we are not agreeing to.

18              MS. ELKJER:  I'm not even asking you to

19  execute anything.  I'm just saying that the TRO that's

20  in place right now is extended until the injunction is

21  put in writing --

22              MR. ASHWORTH:  What the judge is saying

23  is do it right now.

24              THE COURT:  Why not just go ahead and do

25  the temporary injunction right now?

1          MR. ELROD:  We can do that, Your Honor.

2          MS. ELKJER:  Okay.

3          MR. ELROD:  I'm just concerned.  I need

4     Ms. Elkjer's assurance, like Mr. LeClair and I have

5     given to this Court, that this is a binding settlement

6     we are doing today, not that we are going to have some

7     issues, is it foggy or is it --

8               I mean, I think the terms are very clear,

9     and we need to have Ms. Elkjer commit on her client's

10    behalf, and we need to have Mr. Marsh commit on his

11    client's behalf, as Mr. LeClair and I have said.  And

12    I guess we need Mr. Ashworth to do the same thing.

13          MR. ASHWORTH:  Your Honor, I'm Pruitt

14    Ashworth, and I represent Michael Farmar.  He is one

15    of the defendants in this lawsuit.  He also has an

16    action in Mexico against money that is -- from an

17    account of Bancomer against Avia de Mexico.

18               One of the things -- and generally my

19    client agrees with everything that has been said.  But

20    there is one clarification that I need to have because

21    when the parties are talking about the, quote, actions

22    pending in Mexico, it looks like --

23               I understood from our earlier discussions

24    that what was going to happen with regard to Mr. Farmar

25    is that a judgment was going to be dismissed, and then

1    that money was going to be put -- stay in Mexico until
2    it was transferred here to the United States.

3            But you also said at another point that,
4    quote, all the actions pending in Mexico are still
5    going to be fought.  And so I need to be -- I need it
6    to be clarified as to what I understood, ways that
7    Mr. Farmar -- Avia de Mexico was going to withdraw its
8    objection to my client's appeal and, therefore, that
9    money -- that appeal would, on my client's behalf,
10   would become final in my client's favor.  That money
11   will stay in Mexico until the parties agree how it will
12   come to the United States.

13           MR. LeCLAIR:  Well, I think I can clarify
14   that, and I think the issue is this.  And this goes
15   back to the issue about an injunction between Ms.
16   Elkjer and Mr. Elrod.

17           The problem is, we have -- we have two
18   parties who are Dallas residents or are subject to
19   jurisdiction of this court:  Dr. Navarro and Michael
20   Farmar.  And what we want is to be sure that we have
21   in place appropriate injunction power and contempt of
22   this court as necessary, that when and if they -- we
23   are going to allow them to get control of this money,
24   that in fact it will be brought up here in escrow as we
25   have agreed -- as all the parties have agreed.

1              So I am fine to do whatever is necessary

2      to get the money to Michael Farmar as soon as I have an

3      injunctive provision in place that assures me that the

4      full power of this court will assist me in getting that

5      money up here to the United States as we have agreed

6      that it will happen.

7              MR. ASHWORTH:  My client has no problem

8      with that.  What I'm trying to do is deal with a -- a

9      clarification because there are two other lawsuits in

10     Mexico that are being fought.

11             MR. ELROD:  Your Honor, if I may

12     interrupt.

13             THE COURT:  Yes, sir.

14             MR. ELROD:  He is absolutely correct,

15     we have made that agreement.  What we are going to do

16     is, Avia de Mexico will remove its objection to Mr.

17     Farmar's lawsuit.  That will go to judgment so that we

18     can then move the money up to an escrow account that

19     we agree on in Dallas.

20             Now, the reason we want a mutual

21     injunction is for the same reasons Mr. LeClair wants

22     his injunction.  We want to make sure that they are not

23     taking actions that are going to harm Avia de Mexico

24     long term or cause problems in resolving the Mexican

25     causes of action.  And that's why it has to be mutual,

1   and that's why we are agreeing to jointly take these

2   efforts. So Mr. Ashworth's concern is not a concern.

3                   THE COURT: I would encourage you all, as

4   soon as possible, to prepare an order for me to sign.

5                   And I think there is some doubt under

6   Texas law about not having a bond, even if it is $100,

7   to support the temporary injunction. And maybe there

8   is something already in place in the TRO, but I would

9   encourage you to prepare an order and get my signature

10  on it just as soon as you can.

11                  MR. ELROD: Yes, Your Honor.

12                  THE COURT: Now, and if you want to stay

13  here and -- I don't know -- we can go off the record

14  long enough to let David answer. I don't know if he's

15  in a position where he can assist you all in

16  preparation of an order or not.

17                  THE COURT REPORTER: Certainly. I would

18  be glad to help with that.

19                  MR. ELROD: I still need Mr. Marsh and

20  Ms. Elkjer to affirmatively state -- and I don't know

21  if Mr. Ashworth has -- that in fact these terms are

22  binding on their clients as a settlement agreement.

23                  MR. MARSH: My name is Curtis Marsh, and

24  I represent Mr. Musselman. On behalf of Mr. Musselman,

25  it is agreed.

1          MS. ELKJER:  And with me, it is so

2    agreed.  But I'm concerned about the injunction, and

3    that is assuming that we get the injunction in place.

4          MR. ASHWORTH:  Your Honor, I represent

5    Michael Farmar, and we do agree with the terms that

6    we have been discussing today and the statements or

7    clarification with regard to Mr. Farmar's action in

8    Mexico.

9          MS. ELKJER:  Our Mexican attorney, Miguel

10   Abramo, has one clarification that he would like to

11   make.

12          MR. ABRAMO MARTINEZ:  Just to clarify --

13          MR. ELROD:  State your name for the

14   record.

15          MR. ABRAMO MARTINEZ:  My name is Miguel

16   Abramo.  Just to clarify, under Mexican law, what we

17   agree or what we are going to do under Farmar's case,

18   Farmar has to dismiss -- he filed against appeal

19   resolution.

20          And, simultaneously, we are going to have

21   an agreement before the Court where -- where Avia de

22   Mexico will agree to pay Farmar that money, and that's

23   a final resolution.  That agreement itself is binding

24   resolution, like this agreement we are doing here.

25   So that's the way it will work out --

1               (There was a discussion off the record.)

2               MR. ABRAMO MARTINEZ:  Yes, that's why the

3    agreement -- that's why the agreement --

4               (There was a discussion off the record.)

5               THE COURT:  Now, let's -- just one person

6    needs to speak at a time if we want to keep a record.

7               MR. ABRAMO MARTINEZ:  That's why the

8    agreement for tax purposes for Avia de Mexico because

9    there was a concern about it.  That agreement is a

10   resolution, and it is like -- it is like an expense

11   being made by Avia de Mexico in favor of Mr. Farmar.

12   And then Mr. Farmar, as I understood, has an obligation

13   because of this agreement to disburse -- put the money

14   here now in an account.

15              MR. APARICIO MORENO:  I just want to say

16   we agree.  We agree with the settlement in court, and

17   with that settlement we will present in the other court

18   saying we have reached a settlement, and both parties

19   will represent that.

20              MR. ABRAMO MARTINEZ:  Yes.

21              MS. ELKJER:  And that settlement will be

22   presented to the court before any other deadlines in

23   the Farmar lawsuit?

24              MR. APARICIO MORENO:  That will be a

25   cause of the dismissal.

1          MR. ABRAMO MARTINEZ:  And that will be

2    signed by Dr. Navarro and myself representing Avia and

3    by Farmar's attorney for Farmar himself.

4          MS. ELKJER:  And it will have to be filed

5    before April 25th because there are deadlines in that

6    case that Avia would have to take if the case is not

7    dismissed by April 25th, if the -- in Mexico.

8          MR. APARICIO MORENO:  I'm sorry.  And

9    this agreement will be amparo in Mexico.  Is that

10   okay?

11         MR. ABRAMO MARTINEZ:  No problem.  No

12   problem.

13         THE COURT:  I heard everybody commit that

14   this is their agreement.  I'm not sure I heard Mr.

15   LeClair commit.  Maybe you did.

16         MR. LeCLAIR:  Oh, I thought I did, Your

17   Honor.  But certainly on behalf of Mr. Hicks and Mr.

18   Furst, we agree to these terms and the amount that we

19   are to be paid in accordance with those terms.

20         THE COURT:  Have all parties now on the

21   record entered their agreement to this settlement

22   agreement?

23         MR. LILLARD:  I'm Tom Lillard, and I'm

24   here representing Mr. Lafield.  And to the extent that

25   we are involved, we agree to the settlement agreement

1    that's been reached, primarily the part dealing with

2    complete, full, and mutual releases among all the

3    parties.

4                    (There was a discussion off the record.)

5                    THE COURT:   Now, what logistically can we

6    do to --

7                    MR. PORTERFIELD:   Your Honor --

8                    THE COURT:   Oh, excuse me.

9                    MR. PORTERFIELD:   -- I'm Collin

10   Porterfield.  I'm here for John Hughett.  He is a

11   third-party defendant.  I'm in the same position as

12   counsel for Hunton and Williams in that regard.  All

13   we care about is getting Mr. Hughett out of this.

14                   THE COURT:   But you agree as far as your

15   client is involved?

16                   MR. PORTERFIELD:   I do.

17                   MR. LeCLAIR:   I probably need to make a

18   clarification out of an abundance of caution.  I know

19   that this is a general release and that my clients,

20   Mr. Hicks and Mr. Furst, don't have any other business

21   relationships with these other folks except Mr.

22   Musselman.

23                   So I want to be careful -- and this is

24   just out of an abundance of caution.  His counsel and

25   I can work out the details to make sure that if there

1  are other business relationships, that we are not

2  unintentionally releasing some other business

3  obligation unrelated to this.

4        MR. ELROD:  If there is, we can just

5  carve it out.

6        MR. LeCLAIR:  That's a -- I don't think

7  that's an issue with anybody.  I just wanted to, out

8  of an abundance of caution, be careful about that.

9        THE COURT:  Does that cover all the

10  parties?

11        MR. ELROD:  Yes, Your Honor.

12        THE COURT:  What can we do to put

13  together to sign an order on behalf of the 192nd

14  District Court today?

15        MR. ELROD:  Your Honor, all I think we

16  need to do is sit down and pen out a mutual injunction

17  and sign it and have the Court stamp it, and we are

18  ready to go.

19        MS. ELKJER:  I think we even have a

20  computer here.

21        MR. LeCLAIR:  I have a computer here.

22        THE COURT:  Why don't you all remain here

23  to do that.  And I will move my meeting, which was at

24  noon, to some other place.  Okay?

25        MR. ELROD:  Thank you, Your Honor.